Case 2:15-cv-05685-NRM-LGD    Document 278-11    Filed 07/17/26    Page 1 of 90 PageID #: 2954

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

Case No.: 2:15-cv-05685 (NRM) (LRD)

---------------------------------------x

BRYAN MC CLURKIN,

                         Plaintiff,

            -against-

SUFFOLK COUNTY; CHARLES EWALD in his

Official Capacity as Warden; and Correction

Officers CHARLES WAGNER, Shield #1225,

MICHAEL SITER, Shield # 1337, and RONALD

MAIORINO, Shield # 1112,

                         Defendants.

---------------------------------------x

                         December 8, 2025

                         10:01 a.m.


    Remote Videotaped Virtual Zoom Deposition

of KEVIN FLAHERTY, taken by Plaintiff, pursuant

to 30(b)(1) Notice, with the Witness located in

Happauge, New York, before William Visconti, a

Shorthand Reporter and Notary Public within and

for the State of New York.

                                        EXHIBIT J

A P P E A R A N C E S:

COVINGTON & BURLING LLP

Attorneys for Plaintiff

620 Eighth Avenue

New York, NY 10018-1495

BY:     KYLE CHOW, ESQ.

kchow@cov.com

APARNA SUNDARAM, ESQ.

asundaram@cov.com


SUFFOLK COUNTY DEPARTMENT OF LAW

STATE   FEDERAL TORTS BUREAU

Attorneys for Defendants

100 Veterans Memorial Highway, 5th Floor

Happauge, New York 11788


BY:     KYLE WOOD, ESQ.

kyle.wood@suffolkcountyny.gov


ALSO PRESENT:

LEE BOWRY, Videographer

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein that filing and sealing be and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed and sworn to before any officer authorized to administer an oath with the same force and effect as if signed and sworn to before the Court.

THE VIDEOGRAPHER: Good morning. We are going on the record at 10:10 a.m. on December 8th, 2025.

Please note that this deposition is being conducted remotely using virtual technology. Quality of recording depends on the quality of camera and internet connection of participants. What is seen from the witness and heard on screen is what will be recorded. Audio and video recording will continue to take place unless all parties agree to go off the record.

This is media unit one of the video recorded deposition of Sergeant Kevin Flaherty, retired, taken by counsel for Plaintiffs in the matter of Bryan McClurkin versus Suffolk County, et al. filed in the United States District Court Eastern District of New York, case number, 2:15-cv-05685 (NRM) (LRD).

My name is Lee Bowry representing Veritext New York and I am the videographer. The court reporter is

William Visconti also with Veritext.  I am not related to any party in this action nor am I financially interested in the outcome. If there are any objections to proceeding please state them at the time of your appearance.

Counsel attending remotely will now state their appearances and affiliations for the record beginning with the noticing attorney.

MR. CHOW:  Kyle Chow, I'm an attorney from Covington & Burling LLP on behalf of Plaintiff Mr. Bryan McClurkin and with me is my colleague Aparna Sundaram also from Covington & Burling.

MR. WOOD:  Counsel for the Suffolk County Defendants, Kyle Wood from the Suffolk County Attorney's Office again here on behalf of both the county and any of the named Defendants.

THE VIDEOGRAPHER:  Will the court reporter swear in the witness and then counsel may proceed.

Page 6

K E V I N   M.   F L A H E R T Y,

having been first duly sworn by the Notary Public,

was examined and testified as follows:

EXAMINATION CONDUCTED BY MR. CHOW:

Q.    Good morning, Mr. Flaherty.  My name is Kyle Chow, I'm an attorney from the law firm of Covington & Burling and I represent the Plaintiff in this matter, Bryan McClurkin.

Can you please start off by stating your full name for the record?

A.    My full name is Kevin middle initial is M as in Michael, last name Flaherty.

Q.    Can you please provide your address?

A.    100 Center Drive, Riverhead, New York 11901.

Q.    Mr. Flaherty, have you ever testified at a deposition before?

A.    I believe so, yes.

Q.    How many times?

A.    I believe once.

Q.    When was that?

A.    In the mid to late '90s.

Q.    Do you remember what that case was

Case 2:15-cv-05636-NRW-LGD   Document 2781-11   Filed 07/17/26   Page 7 of 90 PageID #: 2968

KEVIN FLAHERTY

about?

A.    Not off the top my head, no.

Q.    Was it related to your work at Suffolk County?

A.    Yes, it was.

Q.    Have you ever testified in court before?

A.    Yes.

Q.    When was that?

A.    That was in the 2000s.  It was county court.

Q.    How many times?

A.    Just once.

Q.    What was that case about?

A.    It was an assault on an officer.

Q.    While you were at Suffolk County?

A.    Yes.

Q.    Which facility did the assault take place in?

A.    Riverhead, New York.

Q.    Do you remember the exact year?

A.    No, I don't.  Not offhand.

Q.    Do you remember the allegations?

A.    It was an assault by an inmate on

KEVIN FLAHERTY

an officer.

Q.    Do you remember the outcome?

A.    The inmate was found guilty.

Q.    What did you testify as to?

A.    My role on an extraction team.

Q.    So did the assault happen during the exchange?

A.    There was an assault prior and there was an assault on the extraction team.

Q.    Mr. Flaherty, so this deposition is happening remotely over video.  So the ground rules will be a little different from to the extent that you even remember it, your deposition that you took in the 1990s will be will be a little different here.

As an initial the matter if at any point during the deposition you have any trouble hearing or seeing me, can you please let me know?

A.    Yes.

Q.    There should be a link in the chat for the Zoom session that directs you to the exhibit viewer for this deposition.  I believe that your attorney had already opened it, but

Case 2:15-cv-03636-NRW-LGD    Document 2781-11    Filed 07/17/26    Page 9 of 90 PageID #: 2560

KEVIN FLAHERTY

can you please let me know or can you please open up the link and see if you have access to the exhibit viewer?

MR. WOOD:  Kyle, I'm just checking it again and we see the Exhibit Share, it doesn't indicate anything has been download yet, but we see it.

Q.    There shouldn't be any exhibits in there right now, but we will want to talk to you about a few exhibits and we'll share them in that folder.  We might ask that you just refresh the folder when we log an exhibit on to it and you'll be able to download the exhibit and view it at your leisure.

Other than the Zoom window and the exhibit viewer, can you confirm that you have nothing else open on your computer.

MR. WOOD:  By counsel, just the Exhibit Share which the login is open on the computer, that's it.  So there is nothing else for him to be able to look at.

Q.    Can you also confirm there is no e-mail, chats, message applications that are open on the computer?

Case 2:15-cv-05686-NR-MRG-LGD Document 281278-1 Filed 07/17/23/23 Page 10 of 90 Page ID Page ID 2563951

KEVIN FLAHERTY

MR. WOOD:   The only think that's open is obviously the video feed that we are seeing right now as well as a screen saver on another thing.  There is no chat or e-mails or anything, paper wise in front of witness to view.

Q.     Can you also confirm that you don't have any other means of electronic communication on you?

MR. WOOD:   By counsel, he is sitting in front of the computer, he does not have his phone or anything with him. And he is as clearly on the video sitting and waiting.

Q.     Do you have any documents in front of you?

A.     No, I do not.

Q.     Other than Mr. Wood, is there anybody else in the room with you?

A.     No, there is no one else in the room besides me and Mr. Wood.

Q.     If somebody comes into the room during the deposition, can you let us know?

A.     Yes.

Case 2:15-cv-05686-NR-MRG-LGD Document 281-1 Filed 07/17/23/23 Page Page 11 of 190 of 90 PageID Page ID #2564 952

KEVIN FLAHERTY

Q.      Mr. Flaherty, do you understand that you will be testifying under oath today?

A.      Yes, I do.

Q.      Do you understand that that is the same oath that you would take if you were in court in front of a judge?

A.      Yes, I do.

Q.      Do you understand that as to that oath you're required to tell the truth?

A.      Yes.

Q.      And that you should also provide full and complete answers to my questions?

A.      Yes, I do.

Q.      Is there any reason that you can think of that would prevent you from understanding my questions today?

A.      No.

Q.      Is there anything that would prevent you from providing full and complete answers?

A.      No.

Q.      Have you taken or consumed anything that would impair your ability to understand my questions or provide truthful

Case 2:15-cv-05685-NR-MRG-LGD Document 281-1 Filed 07/17/23 Page 12 of 90 Page ID #2565953

KEVIN FLAHERTY

answers?

        A.      No.

        Q.      Are you under the influence of any drugs or alcohol that would prevent you in providing -- from understanding my questions or providing full and truthful answers?

        A.      No, I am not.

        Q.      There are a few other ground rules that I would like to go over with you just to make sure that the court reporter can take down your testimony.  As an initial matter for every question that I ask can you please wait until I complete my question before you begin your answer?

        A.      Yes.

        Q.      And likewise when you give me an answer I will try not to start my question, my next question until you provide your full answer.  Is that okay?

        A.      Yes.

        Q.      Separately, because the court reporter is transcribing your answers, you must answer all of my questions audibly.  Will you committed to answer my questions orally and not

Case 2:15-cv-05686-NR-MRG-LGD Document 281-1 Filed 07/17/23 Page 13 of 90 PageID Page ID #: 2566 954

KEVIN FLAHERTY

answering by shaking your head or gesturing?

A.    Yes, I will answer audibly.

Q.    If anything I say is unclear or you don't understand any of my questions, can you please let me know?

A.    Yes, I will.

Q.    If you let me know I will try to clarify the question for you, otherwise I will assume that you understood my question.  Do you understand?

A.    Yes, I do.

Q.    Your attorney may object to some of my questions from time to time, unless Mr. Wood directs you not to answer, do you understand that you should still answer my question?

A.    Yes, I do.

Q.    If you need a break at any time can you please let me know and we will take it at the next convenient moment?

A.    Yes, I will.

Q.    The only request that I have for you is that you answer any pending questions.

A.    Okay.

Case 2:15-cv-05686-NR-MRG-DGD Document 281278-1 Filed 07/17/26/13/26 Page 14 of 190 of 90 PageID Page ID 2567 1955

KEVIN FLAHERTY

Q.      Mr. Flaherty, did you do anything to prepare for this deposition?

A.      I met with my attorney.

Q.      When did you meet with your attorney?

A.      On Friday.

Q.      How long did you meet with him for?

A.      About an hour over the phone.

Q.      Have you discussed this deposition with anyone else?

A.      No.

Q.      Have you talked to any corrections officers about this deposition?

A.      No, I have not.

Q.      Did you review any documents in preparing for this deposition?

A.      Yes I did.

Q.      As we are going through documents, if you review one of the documents that you had previously reviewed, can you please let me know?

A.      Yes.

Q.      Mr. Flaherty, did you attend

Case 2:15-cv-05685-MRP-LGD Document 281-1 Filed 07/17/23 Page 15 of 90 PageID #: 2568956

KEVIN FLAHERTY

college?

A.      Yes, I did.

Q.      Where did you go to college?

A.      Suffolk Community College for my two years, and my four year Long Island C.W. Post.

Q.      I couldn't hear the second school that you went to?

A.      LIU C.W. Post.

Q.      What did you study when you were at Suffolk Community College?

A.      Finance and management.

Q.      What did you study at LI C.W. Post?

A.      Again, finance and management.

Q.      When did you graduate?

A.      1988.

Q.      When did you graduate from Suffolk Community College?

A.      Suffolk Community College was January, '96.

Q.      And then from C.W. Post was '98?

A.      '98, correct.

Q.      Do you have any post-secondary

Case 2:15-cv-05686-NR-MRG-LGD Document 281-1 Filed 07/17/23 Page 16 of 90 PageID #: 2569 1957

KEVIN FLAHERTY

education?

A.    No, I do not.

Q.    Are you currently employed?

A.    No.

Q.    Are you retired?

A.    Yes, I am.

Q.    When did you retire?

A.    I retired January of 2001.

Q.    2020?

A.    Sorry, 2021.

Q.    January, 2021?

A.    Yes, that's correct.

Q.    Where did you work before you retired?

A.    I worked at the Suffolk County Sheriff's Department Corrections Division.

Q.    When did you start working at Suffolk County?

A.    I was sworn in in 1989, October.

Q.    What was your first role at Suffolk County?

A.    My first role was corrections officer on midnights at the Riverhead facility.

Q.    How long were you a corrections

Case 2:15-cv-05686-NR-MRLGD Document 281278-1 Filed 07/17/26/13/28 Page 17 of 190 Page ID Page ID #2570958

KEVIN FLAHERTY

officer at the midnight shift at Riverhead?

A.    For four years.

Q.    That was about from 1989 to 1993 or so?

A.    More from 1990 -- I was in the academy for 12 weeks and then I worked at the Riverhead facility on midnights for four years. So from 1990 to 1994.

Q.    What was your role after that?

A.    I switched to A Crew at the Riverhead facility.  I was a correction officer on A Crew.

Q.    Who how long were you a corrections officer on A Crew?

A.    From 1994 to 2001.

Q.    In 2001 what was your role?

A.    I was a yard officer, a recreation yard officer for 2 1/2 years.

Q.    So about until 2003 or so?

A.    From late 2001 to early 2004 when I got promoted.

Q.    You just mentioned that you were promoted in 2004.  What were you promoted to?

A.    I was promoted to sergeant.

Case 2:15-cv-05686-NR-MRL GD Document 281-1 Filed 07/17/26/13/26 Page 18 of 90 PageID Page ID #: 1959

KEVIN FLAHERTY

Q. How long were you a sergeant?

A. From November of 2004 until my retirement in January of 2021.

Q. Were you just sergeant at the Riverhead facility the entire time?

A. I was a sergeant at the Riverhead facility from November of 2004 assigned to A Crew until April of 2013 when I transferred to the Yaphank facility.

Q. And how long were you a sergeant at Yaphank?

A. I was a sergeant at the Yaphank facility from April, 2014 until my retirement in January of 2021.

Q. What were your duties in your role as a sergeant?

A. As a sergeant I oversaw up to 20 officers, 25 officers, supervising inmates in various housing situations.

Q. Was that the same -- was your role similar in Riverhead and Yaphank?

A. Yes, similar, but a little bit different because of the different housing areas.

Case 2:15-cv-05686-NR-MRLGD Document 281278-1 Filed 07/17/26/13/23 Page 19 of 190 of 90 PageID Page ID 25721960

KEVIN FLAHERTY

Q.      So what was specific about your role in Yaphank?

A.      In Yaphank I was assigned to A Crew from 2013 to 2015.  As a crew sergeant with a crew of about 65 officers and over 600 inmates.

Q.      What were your responsibilities at Yaphank?

A.      Again, I was a duty sergeant of A Crew.  So we oversaw up to around 65 officers and about 600 inmates.

Q.      Who would you report to in your role as a sergeant?

A.      I would report to my duty lieutenants.

Q.      Mr. Flaherty, have you ever been disciplined at work?

A.      No, I have not.

Q.      Have you had to discipline any of your officers as a sergeant?

A.      No, I have not.

Q.      Mr. Flaherty, do you know what a Sheriff's Emergency Response Team is?

A.      Yes, I do.

Case 2:15-cv-05686-NR-MRG-LGD Document 281-1 Filed 07/17/23 Page 20 of 90 PageID Page #: 2573961

KEVIN FLAHERTY

Q.    If I refer to that as a SERT team, will you understand what I mean?

A.    Yes, I will.

Q.    What is a SERT team?

A.    Well, it's self-explanatory. Sheriff Emergency Response Team, we are basically officers that are trained more than entry level corrections officers to deal with different situations that might come up in the facility.

Q.    Were you trained in SERT?

A.    Yes, I was.

Q.    While you were a sergeant, would you be a part of a SERT team or was that just when you were a corrections officer?

A.    No, I was a part of the SERT team as a corrections officer and as a sergeant up until 2016.

Q.    Specific to your role as a sergeant as part of a SERT team, what were your responsibilities as a sergeant overseeing SERT teams?

A.    If I was pulled as a sergeant for the SERT team I would be overseeing up to five

Case 2:15-cv-05672-NR-MRL-GD Document 281-1 Filed 07/17/23 Page 21 of 90 PageID Page ID #: 2574962

Page 21

KEVIN FLAHERTY

officers who would be patrolling the Yaphank facility.

Q.    While you were involved with the SERT teams at the Yaphank facility, did you ever witness any cell extractions?

A.    Yes, I did.

Q.    How many cell extractions did you oversee?

A.    I can't put a number on it. Probably -- I can't put a number on it.  It is numerous.

Q.    Was it common?

A.    Yes, fairly common.

Q.    Would you say once a month?

A.    Yeah, it would happen once a month, sometimes more often and sometimes it wouldn't happen for a few months.

Q.    In 2016 why did you stop, why did you decide to stop being involved with SERT?

A.    I suffered several injuries.

Q.    Were those injuries as part of your involvement in SERT?

A.    Yes, they were.

Q.    How you did first become involved

Case 2:15-cv-05685-SJR-MRJ-LGD Document 281-1 Filed 07/17/26 Page 22 of 90 PageID Page ID #: 2575 963

KEVIN FLAHERTY

with SERT?

A.      When they started the SERT team back in 1997 I was recruited to try out for the team.

Q.      Were there any prerequisites that you had to have prior to joining SERT?

A.      Not that I know of.

Q.      Did you undergo any specific trainings for SERT?

A.      Yes, we did.

Q.      Do you recall what those trainings were?

A.      We were sent to Rikers Island to be trained by the Rikers Island ESU team.

Q.      Were you trained in cell extractions?

A.      Yes, we were.

Q.      Other than cell extractions, what would SERT teams handle at Suffolk?

A.      Medical emergencies, mass inmate movement.  If we were moving a large number of inmates from one housing area to another, SERT would oversee that as a security measure.

Q.      As a corrections officer when you

Case 2:15-cv-05686-NR-MRG-LGD Document 281278-1 Filed 07/17/23 Page 23 of 90 PageID Page ID #: 2576 964

KEVIN FLAHERTY

were part of a SERT team, did you have any specific role?

A.      We had a five man team, so your role could be one of several things on the team.  It all depended on when I was a corrections officer with the sergeant or lieutenant where that sergeant or lieutenant wanted you to be on the SERT team, on the extraction team I should say.

Q.      When you were a sergeant overseeing a SERT extraction team, what were your responsibilities?

A.      My responsibilities were to brief the team on the situation that we were going into.  Made sure everybody was set and ready for what we were about to go into and to oversee everything that was done as far as I would deal with the inmate and I would make the determination based on the inmate's actions if we would enter the cell or the inmate would cuff up and exit the cell under his own power.

Q.      Would it be your decision whether to call a SERT team?

A.      No, that would not be my decision.

Case 2:15-cv-05688-MR-GD Document 218-1 Filed 07/17/23 Page 24 of 90 PageID #: 25771965

KEVIN FLAHERTY

Q.    Whose decision would that be?

A.    That would be above me.  A lieutenant or above.

Q.    Would you assign roles?

A.    Sometimes I would, sometimes the lieutenant would assign the roles.

Q.    During a SERT extraction would there always be both a sergeant and lieutenant?

A.    Yes, there would be.

Q.    In 2015 specifically do you recall how many SERT teams you would have been part of?

A.    I don't recall.

Q.    In your experience as a sergeant overseeing SERT teams, how often would physical force actually be used against an inmate?

A.    That was all dependent upon the inmate's actions.  If the inmate complies, the only force would be putting handcuffs on the inmate through either the cell, the slot in the cell door or through the bars and the inmate would walk out.

If the inmate didn't comply, he was given several opportunities to comply, but

Case 2:15-cv-05686-NR-MRG-LGD Document 281278-1 Filed 07/17/263/2Page Page 25 of 290 of 90 PageID Page ID 2578.966

KEVIN FLAHERTY

the ultimate decision to use force would be by the inmate's actions.

Q.    But in your role as a sergeant would you make the ultimate decision based off the inmate's actions whether to enter the cell or not?

A.    Yes, I would.

Q.    Would you say it is more common that the inmate would comply or was it more common that you would need to use the force against the inmate?

A.    It was more common that the inmate would comply, which is our ultimate goal.

Q.    If an inmate complied, would they be put into an emergency restraint chair?

A.    Yes, they would.

Q.    Was that part of standard practice?

A.    Yes, it was.

Q.    Who would be responsible for securing the inmate in the emergency restraint chair?

A.    The assembled SERT team would be responsible for putting the inmate in the

KEVIN FLAHERTY

restraint chair and making sure that the restates were applied properly or proper fit and from that point on SERT would escort the inmate wherever he had to go while he was in the chair.

Q. Were you working on a SERT team on May 8, 2015?

A. Off the top of my head I don't know, but I did read my report and yes, I was on duty.

Q. When you say your report, what report are you referring to?

A. A report that I signed off on concerning this incident.

Q. Are you referring to an incident report form?

A. Yes, I am.

Q. Do you know who Mr. Bryan McClurkin is?

A. I just know him as being an inmate at both Riverhead and the Yaphank facility.

Q. Did you remember him -- beyond reviewing the incident report form that you reviewed with your counsel, do you remember

Case 2:15-cv-05685-NR-MRG-LGD Document 281278-1 Filed 07/17/23 Page 27 of 90 Page ID #: 2580 968

KEVIN FLAHERTY

Mr. McClurkin beyond just this incident?

A.    Not really.  The name, yes.  Other than that, really no specifics.

Q.    Why do you remember the name?

A.    Well, it was a common name, we had a deputy sheriff whose last name was McClurkin also.  So any time McClurkin came up, it was are we talking about the officer or are we talking about the inmate.

Q.    Do you know whether they are related?

A.    No.

Q.    Have you ever talked with any other corrections officers about Mr. McClurkin the inmate?

A.    No.

Q.    Do you recall when was your first time that you would first encountered Mr. McClurkin?

A.    I have no clue when I first encountered Mr. McClurkin.

Q.    Let's share the incident report with you.

MR. CHOW:    Aparna, can you introduce the document previously marked as

Case 2:15-cv-05686-NR-MRG-LGD Document 281-1 Filed 07/17/23 Page 28 of 90 PageID Page 2581969

KEVIN FLAHERTY

Plaintiff's Exhibit 1.

(Plaintiff's Exhibit 1 for identification, Incident Report.)

Q.    Mr. Flaherty, can you please open it up and let me know when you have it open?

MR. WOOD:    We could see it.  I'm just making it larger for him so he can read it.

MR. CHOW:    Perfectly fine.

MR. WOOD:    So I have it before him and I guess the middle section, so to speak, is up and he is reviewing it.

(Witness reviewing document.)

Q.    Mr. Flaherty, can you let me know when you have had a second to review the report form?

A.    Yep, I reviewed.  Good to go.

Q.    What is this document?

A.    This is a standard incident report from the Suffolk County Sheriff's Department.

Q.    What does this document reflect?

A.    Basically it reflects an occurrence that happens outside of the normal everyday operations of the facility.

Case 2:15-cv-05685-NR-MRG-LGD Document 281-1 Filed 07/17/23/23 Page 29 of 290 Page 29 of 290 PageID Page 1258 1970 #1258 1970

KEVIN FLAHERTY

Q.      This specific report form, what date was it drafted?

MR. WOOD:   I'm just scrolling up for him so he can see the top.

A.      5/8/2015.

Q.      Is that the document that you reviewed last Friday?

A.      Yes, it is.

Q.      Did you draft that incident report form?

A.      The original draft was not done by me, but I did sign off on the officer's report of the incident.

Q.      Do you know when you would have signed off on the officer's report?

A.      I would have signed off after the incident that is described.

Q.      Would it have been immediately afterwards?

A.      Yeah, immediately.  I would say within a half an hour, maybe 45 minutes of the incident being completed.

Q.      Why would you sign off on the incident report form?

Case 2:15-cv-05685-NR-MRG-LGD Document 281278-1 Filed 07/17/23/23 Page 30 of 390 of 90 PageID Page #: 2583971

KEVIN FLAHERTY

A.      Because I was the supervisor in charge of the area the incident happened.

Q.      Do you signed off to reflect that you had personally seen these events and they are accurate or do you just sign off to confirm the officer's description?

A.      I'm signing off on the officer's description of what happened and anything that I had seen personally concerning the incident.

Q.      Did you see before the officers description that was drafted, did you personally review every underlying event that's described in this report?

A.      Can you say that again?

Q.      Sure.  Let's go to the top.  At the top of this document in the from field it says the officer that drafted this was Charles Wagner.  Do you see that?

A.      Yes, I do.

Q.      Do you recall whether or not Charles Wagner drafted this document?

A.      Yes, I do.

Q.      And in the to field it says to Lieutenant McKenna, D.?

Case 2:15-cv-05686-KM-JBC Document 281-1 Filed 07/17/23 Page 31 of 90 PageID Page ID #: 2584972

KEVIN FLAHERTY

A.      Yes.

Q.      Who is Lieutenant McKenna?

A.      He was the duty lieutenant in charge of A Crew that day.

Q.      Who is Charles Wagner?

A.      Charles Wagner is an officer assigned to A Crew, assigned to work in the -- in booking where I was the supervisor.

Q.      Is Charles Wagner the one that drafted this report?

A.      Yes, he is.

Q.      So when you say you signed off on it, is this your signature at the end of the signature paragraph?

A.      Yes it is.  It is my initials, my shield number and my signature.

Q.      Did you sign off on any other portion of this report?

A.      Any other portion, no, just what -- just the part that you see.  That second paragraph basically my narrative of what occurred.

Q.      So you didn't sign off on the first paragraph?

Case 2:15-cv-05683-PR-MRG-LGD Document 281-1 Filed 07/17/23 Page 32 of 90 PageID Page #: 2585

KEVIN FLAHERTY

A.      Yes, where I sign off when Officer Wagner says "Sergeant Flaherty notified" then my part of the report comes in which is the second paragraph and by me signing where I signed and initialed with my shield number, I'm signing for everything above that.

Q.      But you weren't signing off on whatever comes below that?

A.      No, I was not.

Q.      What is the process for drafting these?  Charles Wagner drafts the first two paragraphs and you would review and sign off and Charles Wagner would draft the third paragraph and the lieutenant would sign off or --

A.      No, Officer Wagner would write the first paragraph where he notified me.  The second paragraph is written by me and I sign off on that.  And again, when I initialed with my shield number and sign off on it, I'm signing off on everything above my signature. After that the report goes to the duty lieutenant.

Q.      So in your paragraph starting in

Page 33

KEVIN FLAHERTY

the second paragraph you note that, "Inmate McClurkin had been housed in YPMY009 and was compliant with all orders and information given to him when moved to booking number 4 at 620 hours." Do you see that?

A. Right, yes, I do.

Q. When it says he has been housed in YPMY009, what is that?

A. That is a housing area at the Yaphank -- Yaphank facility medical housing cell number 9.

Q. Do you know why he was in medical housing?

A. No, I do not.

Q. Then it says he was moved to booking number 4. Do you know why he would have been moved to booking?

A. I do not know that.

Q. You write here, "███████████

████████████████████████████████

██████████████████████████████

████████████████████████████████

████████████████████████████████

Do you see that, Mr. Flaherty.

KEVIN FLAHERTY

A.     Yes, I do.

Q.     Do you recall witnessing that?

A.     Yes, I do.

Q.     Is that why you called the SERT extraction team?

A.     That is why I notified the duty lieutenant.

Q.     At then the duty lieutenant called the SERT extraction team?

A.     I believe so, but I'm not sure.

Q.     If you go down to the sixth line in this paragraph. Starting midway through the line there is sentence beginning with, "A SERT extraction team was assembled consisting of SERT COs Zorcik shield, Arce legs, Maiorino left arm, Sitler right arm, Palumbo restraint and CO Donahue video."

A.     Yes, I do.

Q.     Who is CO Zorcik?

A.     CO Zorcik is an officer who was assigned to A Crew.

Q.     When it says he is responsible for shield, what does that mean?

A.     We have a plexiglas shield that we

Case 2:15-cv-05686-NR-MRG-LGD Document 281-1 Filed 07/17/23 Page 35 of 90 PageID #: 2588

KEVIN FLAHERTY

use if we have to enter a cell where an inmate is being violent. The shield officer has that shield and delivers a blow to the inmate.

Q.      And then next is Arce and it says legs.

A.      Yes.

Q.      What does that mean?

A.      Legs, the second person in the stack, as we call it, as we refer to it, is the leg officer. While Officer Zorcik is engaging the inmate with the shield, the leg officer goes in and tries to wrap up the inmate's legs, secure his legs.

Q.      Do you know who Officer Arce is?

A.      Yes.

Q.      Who is Officer Arce?

A.      Officer Arce is an officer assigned to, at the time, A Crew at the Yaphank facility.

Q.      The next is Officer Maiorino for left arm?

A.      Yes.

Q.      What does that indicate?

A.      It indicates that Officer

Case 2:15-cv-05686-NR-MRG-LGD Document 281278-1 Filed 07/17/26 03/23 Page 36 of 360 PageID #: 2589 977

KEVIN FLAHERTY

Maiorino's position on the team is he is to secure the left arm.  If we have to enter the cell.  If the inmate is noncompliant to all orders given and we have to enter the cell, Officer Maiorino is to secure his left arm.

Q.    Who is Officer Maiorino?

A.    He is also an officer assigned to A Crew Yaphank at the time of this incident.

Q.    Then who is Officer M. Sitler?

A.    Officer Sitler is also an officer at the Yaphank facility.  But I'm not sure what crew he was assigned to at that time.

Q.    What was his role as right arm?

A.    Yes, his role was to secure the right arm of the inmate.

Q.    Then who is Officer Palumbo?

A.    Officer Palumbo is an officer assigned to A Crew at the Yaphank facility.

Q.    What was her role as restraints?

A.    As restraints, when we look to secure the inmate, if the inmate complies with all orders given, Officer Palumbo will move up, apply the handcuffs to the inmate, make sure they are put on properly and double locked and

Case 2:15-cv-05686-NR-MRL GDD Document 281 78-1 Filed 07/17/26 3/26 Page 37 of 90 90 PageID Page ID #: 2590 978

KEVIN FLAHERTY

then when we have an opportunity when the gate would open Officer Palumbo would put the leg restraints on the inmate.  Again checking for proper fit and double locking.

Q.      Then who is CO Donahue?

A.      CO Donahue, he an officer assigned to A Crew at the Yaphank facility.

Q.      What is video there mean?

A.      Video means we have a handheld recorder recording the incident -- recording at the time of the incident.

Q.      What is recording?

A.      It is recording the incident from the time the extraction team is assembled to the time the inmate is secured in the restraint chair and put into another cell, he is filming the whole incident.

Q.      Will the videotape record the inmate the entire time?

A.      Yes, it will.

Q.      Do you recall is this consistent -- this description in this paragraph that you wrote of the SERT team consisting of Officer Zorcik, Arce, Maiorino, Sitler, Palumbo and

KEVIN FLAHERTY

Donahue, is that consistent with your recollection of the event?

A.     Yes, it is.

Q.     Are these roles consistent with your recollection of what their roles would have been?

A.     Yes, they are.

Q.     If we go down three lines sort of at the beginning of line there is a sentence starting with, ███████████████ ████ inmate McClurkin was handcuffed behind his back through the food slot, lead out of his cell by COs Maiorino and Sitler and placed in the restraint chair."

A.     Yes.

Q.     Do you recall whether Mr. McClurkin complied with all orders?

A.     Yes, he complied with all orders given.

Q.     Do you recall whether you had to perform a cell extraction or not?

A.     No, we did not.

Q.     When it says he was placed in the restraint chair, do you know where the

Case 2:15-cv-05686-NR-MRG-LGD Document 281-1 Filed 07/17/23 Page 39 of 90 PageID Page: 2591980

KEVIN FLAHERTY

restraint chair would have been located?

A.    I don't understand what you're asking.

Q.    Would the restraint chair have been right outside of the cell, outside the cell door?

A.    Yes, it would have been readily available to move the inmate immediately from the cell to be put in the restraint chair.

Q.    It wouldn't have been located in another cell, for example?

A.    I don't know where it would have been located before the incident, but when the team is assembled the chair is always brought so it is readily available during the incident.

Q.    Then here it's saying McClurkin was secured in the restraint chair, restraints checked for proper fit and double locked and move to booking number 7."   Do you see that sentence?

A.    Yes, I do.

Q.    Do you know where booking number 7 is?

A.    Yes, I do.

Case 2:15-cv-05686-NR-MRG-LGD Document 281278-1 Filed 07/17/26 13/23 Page 40 of 490 of 90 PageID Page ID 2593 #2581

KEVIN FLAHERTY

Q.      Where is that?

A.      If we -- when we took the inmate out of number 4 and put him in the chair, if we are looking at cell number 4, if we looking to the right, 90 degrees, that's where the cell is.  It's a bigger cell, a bigger door so we were able to wheel the chair with inmate McClurkin into that cell.

Q.      Do you recall whether he was -- when he is in booking room 7 or booking cell number 7, is he refrained in the restraint chair the entire time?

A.      Yes, he is.

Q.      Do you remember anything else about the incident other than what you wrote in this paragraph?

A.      The only other thing I will add is every 15 minutes when the inmate first goes into the restraint chair he is seen by medical to make sure he has no injuries or medical complaints.  His vitals are checked and then every 15 minutes after that the inmate is checked by medical to make sure nothing with his physical or medical condition has changed.

Case 2:15-cv-05685-NR-MRG-LGD Document 281-1 Filed 07/17/23 Page 41 of 90 PageID #: 2594982

KEVIN FLAHERTY

Q.    Is that standard procedure?

A.    At the time of this incident, yes.

Q.    Do you recall specifically that standard procedures were followed with respect to Mr. McClurkin?

A.    Yes, they were followed.

Q.    How do you remember that?

A.    It is just what we did.  We wanted to -- everything is on camera, we have opeds (sic) as well as the handhelds, so when an inmate is put in the chair, it is very direct that we have -- we are given -- that is the orders that we were given.  It came down from the sheriff that the inmate is to be checked every is a minute.

Q.    You said everything was on camera, we have opeds as well as handhelds, I'm sorry what was that term that you used?

A.    Overheads.

Q.    Overheads, okay.

A.    Yes.

Q.    Do you recall whether there was an overhead camera regarding Mr. McClurkin being placed into the restraint chair?

A.    Yes, there are overhead cameras

Case 2:15-cv-05685-NR-MRG-LGD Document 281-1 Filed 07/17/23 Page 42 of 90 PageID #: 2595

KEVIN FLAHERTY

all over the facility.

Q.    Would the overhead camera capture the entire event?

A.    Yes, it would have.

Q.    Is there an overhead camera inside of the cell?

A.    I don't believe there is.  I don't believe there is one for privacy issues because the inmates do use the bathroom.

Q.    But it would capture everything on the outside of the cell?

A.    It would capture everything looking into the cell from the outside, but not in the cell itself.

Q.    So it would have captured Mr. McClurkin being handcuffed through the food slot?

A.    Yes, it would have.

Q.    And it would have captured Mr. McClurkin complying with all orders?

A.    Yes, it would have.

Q.    And it would have captured that there was no cell extraction?

A.    Yes.

Case 2:15-cv-05685-NR-MRG-LGD Document 281-1 Filed 07/17/23 Page 43 of 90 PageID #: 2596

KEVIN FLAHERTY

Q.      It also would have captured COs Maiorino and Sitler leading him out of the cell?

A.      Yes, it would have.  The cell door would have opened and I would have directed the inmate to step back out of the cell with his back to us and then officer Sitler and Maiorino would have met him at the threshold of the cell and guided him back into the chair.

Q.      And then it also would have captured him being restrained in the chair?

A.      Yes, it would have captured him being placed in the chair and the restraints being applied properly with proper fit and double locked.

Q.      Would it have been COs Maiorino and Sitler that placed the restraints on him in the restraint chair?

A.      Yes, it would have been along with Officer Palumbo.

Q.      Would Officers Maiorino and Sitler when they were putting him into the restraint chair, I guess would they -- how does it work when an inmate is put into a restraint chair?

Case 2:15-cv-05686-NR-MRG-LGD Document 281-1 Filed 07/17/23 Page 44 of 90 PageID #: 2597 1985

KEVIN FLAHERTY

MR. WOOD:    Objection to the form. You can answer.

THE WITNESS:    I can answer.

MR. WOOD:    Yes.

A.    He would be placed into the chair, his leg restraints would be -- let's start with the upper body.  We have a basically what it looks like a seatbelt that comes over his body to secure him in the chair.  And then his handcuffs would be still cuffed behind his back would be hooked into the chair.

So you would have to see the belt on, he would have his hands still cuffed behind his back hooked into the chair and then the same thing with his leg restraints.  The leg restraints would have taken off and Velcro scraps would have been attached around his ankles.

Q.    When his arms were put behind back, I guess they are already cuffed behind his back, when they're placed into the restraint chair, does it require that -- does the restraint chair -- does placing them into the restraint chair require that their arms be

Case 2:15-cv-05685-NR-MRG-LGD Document 281-1 Filed 07/17/23 Page 45 of 90 PageID #: 2598

KEVIN FLAHERTY

bent at all?

A.    No, not at all.

Q.    You also mentioned earlier I think that this incident would have been captured by both the handheld and the overhead.

Do you recall whether this in fact was captured by both those forms of videotape?

A.    No, I know we have the overhead cameras and handheld camera.  If there was a video camera going, it would have been captured by the video camera, and the cameras are above the -- are in the ceiling, so they are recording everything at all times.

Q.    Have you review any of those camera footage?

A.    No, I have not.

Q.    Did you review any of that camera footage in preparing this report?

MR. WOOD:    Objection to the form.
You can answer.

A.    No, I have not.

Q.    Would you ever after a cell extraction review the camera footage?

A.    If the inmate had -- did not

KEVIN FLAHERTY

comply and we had to enter the cell and use physical force, then the -- we would have looked at the tape and it would have been broken down as far as an assessment of our tactics, but with something like this where the inmate did comply and there was no cell extraction per se, then there would be no need to review the tape.

Q.     You were saying after a cell extraction you would review the tape.  Would you just review the handheld tape or would you review the overhead tape?

A.     Just the handheld.

Q.     For this 5/8 incident it would have been Officer Donahue that was responsible for video recording the incident?

A.     Yes, he was recording the incident.

Q.     Have you review the third paragraph of this report?

A.     No, I just looked at -- I had the whole report.  I just looked at what I did specifically what I wrote.

Q.     Would you have reviewed this

Page 47

KEVIN FLAHERTY

portion of the report contemporaneously?

A.      I probably would have read through the whole report at the time of the incident.

Q.      If I can direct you to the second page of the report and then if you go down, I believe it's 8 lines down towards the end of the sentence or toward the end of line there is a sentence beginning with, "The video was secured in the video locker in the duty lieutenant's office."

A.      Okay.

Q.      Do you see that?

A.      I see the sentence, yes.

Q.      Do you recall whether the video would have been placed in the video locker in the duty lieutenant's office?

A.      That's not part of my -- that's not part of my assignment.  As being a SERT supervisor at this point.

Q.      Would you ever in your role as a supervisor of a SERT team as a sergeant track what happened to the videotape after the incident?

A.      No.

Case 2:15-cv-05686-NR-MRG-LGD Document 281278-1 Filed 07/17/23/23 Page 48 of 90 of 90 PageID Page ID #:601989

KEVIN FLAHERTY

Q. Was that always the responsibility of the duty lieutenant?

A. I know it wasn't the sergeant's responsibility, so...

Q. Then in this specific incident you don't remember what happened to the videotape?

A. No.

Q. Do you recall whether Officer Wagner -- was he present for the entire incident?

A. The SERT incident, no. He would not be -- he was not part of the SERT team. So he would not be involved with what we did, what I signed off on here.

Q. Do you know whether he would have -- was he not at all -- not in the vicinity at all such that he wouldn't able to view what was happening or was he just not involved in terms it wasn't his responsibility to be involved?

A. Where he was I don't know, but I do know he was not involved in the SERT part of this incident. I don't know if he was in the area or not.

Q. So when would your role end in an

Case 2:15-cv-05686-NR-MLG-LGD Document 281-1 Filed 07/17/26 Page 49 of 90 PageID #: 26090

KEVIN FLAHERTY

incident like this?

A.    My role would end -- well, after the inmate is placed in the holding cell, that's when the SERT camera would stop rolling because the inmate is secured, he has been checked by medical and waiting transport to the Riverhead facility.  So the SERT portion of that would be done for that point.  But the booking area was my main supervisory role, so I would have been in that area the whole time that inmate McClurkin was in the restraint chair in number 7 waiting transport.

Q.    What do you recall about Mr. McClurkin during the incident?

MR. WOOD:    Objection to the form, you can answer if you understand.

A.    ████████████████████████ ████████████████████████.  But other than that, that he complied.  ██████████ ██████████████ he was compliant, he didn't fight us, there was no reason for us to enter the cell.  He complied with all the orders that I gave him.  ████████████████████████ ████████████████████.

Case 2:15-cv-05685-NR-MRG-LGD Document 281-1 Filed 07/17/23 Page 50 of 90 PageID Page ID #: 2603991

KEVIN FLAHERTY

Again, like I said, he complied with all orders that were given, we were able to handcuff him, he walked out of the cell backward, we placed him in the chair without incident.

Q.    Do you remember if at any point during the extraction or beforehand that Mr. McClurkin yelled out in pain?

A.    No.

Q.    Was he screaming at all?

A.    No, not at all.

Q.    Did you ever indicate that he was injured?

A.    No, he didn't indicate to me that he was injured and having him evaluated when he was put in the chair is standard operating procedure.  So if he had any medical complaints or any injuries he could have articulated that to the nurse that evaluated him.

Q.    Did he appear to be in discomfort at any point?

A.    Not that I recall, no.

Q.    Did you make physical contact with Mr. McClurkin at any point during the

Case 2:15-cv-05685-NR-MRG-LGD Document 281-1 Filed 07/17/23 Page 51 of 90 PageID #: 4992

KEVIN FLAHERTY

encounter?

A.    No, I did not.

Q.    So out of all the officers, do you know who would have made any physical contact with Mr. McClurkin during the incident?

A.    The only physical contact that would have been made would be applying the handcuffs, applying the leg restraints and when we walked him -- because he is walking backward and has leg restraints on, we want to make sure he doesn't trip and fall and injure himself. So we guide him back to the chair and sit him in the chair.

Q.    So Miss Palumbo would have been the one that applied the handcuffs through the food slot?

A.    Yes.

Q.    Do you know, would his hands have been secured by any of the other officers when he was being cuffed through the food slot?

A.    No, if the inmate complies and he puts his hand through the hand slot, it would be Officer Palumbo applying the restraints.

Q.    And none of the other officers

Case 2:15-cv-05686-NR-MRG-LGD Document 281-1 Filed 07/17/23 Page 52 of 90 PageID Page ID #: 2605

KEVIN FLAHERTY

would hold his arms to make sure he didn't move them?

A.    No, if he was compliant, there would be no reason to.

Q.    I believe before you stated that Mr. Maiorino or Officers Maiorino and Sitler were the ones that led him out of the cell and those two would have been the ones, as you just mentioned, would have led him out because he was walking backwards?

A.    Yes, when he is walking backward and when you have leg restraints on, we guide the inmate back so the inmate doesn't trip and fall and injure himself.

Q.    Would they have held on to his arms or would they have guided him some other way?

A.    No, they would have guided him basically just making sure positioning themselves so if he did stumble they would be able to catch him and prevent him from falling to the ground.

Q.    Do you recall whether Mr. McClurkin had to receive medical attention

KEVIN FLAHERTY

after May 8th encounter?

A.    No, I'm not aware that he had to get any kind of medical treatment afterwards. At the time of the incident the inmate is evaluated by medical staff when he is put into the restraint chair.

Q.    Do you know what happened to Mr. McClurkin after he was moved out of booking?

A.    He was transferred to the Riverhead facility.

Q.    Do you know why he would have been transferred to Riverhead?

A.    Off the top of my head, no.

Q.    The reason isn't included in the report?

A.    Not in my part of the report. Let's see.

(Witness reviewing document.)

A.    Further down in the report where it said he's -- I guess for being suicidal.

Q.    Were you at all involved in decisions regarding inmate transfers between Yaphank and Riverhead?

Case 2:15-cv-05686-NR-MRG-DGD Document 281-1 Filed 07/17/23 Page 54 of 90 PageID #: 26071995
Page ID 2607

KEVIN FLAHERTY

A.    No, I am not.

Q.    Do you know who makes those decisions?

A.    Depending on the inmate, it can be a bunch of different areas involved.

Q.    Are you aware that Mr. McClurkin had surgery on his shoulder a week after this incident?

A.    No, I was not.

Q.    Are you aware that he had a dislocated shoulder?

A.    No, I was not.

Q.    Are you aware of any prior investigations into Mr. McClurkin's injuries?

A.    No, I am not.

Q.    Do you know whether or not there was an internal affairs investigation?

A.    No.

MR. CHOW:   Aparna, I believe we are going to introduce another Exhibit.   I believe this is Plaintiff's Exhibit 16. This is a document bearing the Bates number SC002945.

(Plaintiff's Exhibit 16 for

Case 2:15-cv-05686-NR-MRG-LGD Document 281-1 Filed 07/17/23 Page 55 of 590 PageID Page ID #: 2608 996

KEVIN FLAHERTY

identification, Mr. Flaherty's statement to internal affairs dated 10/5/16.)

Q.      Aparna will share it with you in the Exhibit Share folder.

MR. WOOD:   He has it up in front of him, Kyle.

Q.      Can you let me know when you have had a moment to review it, Mr. Flaherty?

A.      Yep.

(Witness reviewing document.)

A.      Okay.

Q.      Do you know what that document is, Mr. Flaherty?

A.      Yes, it's a statement to internal affairs.

Q.      Is it a statement that you made to internal affairs?

A.      Yes, it is.

Q.      What day did the make that statement?

A.      The date was 10/5/16.

Q.      Do you remember making this statement?

A.      Not off the top of my head, no.

Case 2:15-cv-05685-NR-MRG-LGD Document 281-1 Filed 07/17/23 Page 56 of 90 PageID Page #: 2609 #: 1997

KEVIN FLAHERTY

Q.     Do you know whether this statement was related to the 5/8 incident regarding Mr. McClurkin?

A.     Yes.

Q.     Does that document refresh your recollection as to whether you knew about an internal affairs investigation ensued the 5/8/2015 incident?

MR. WOOD:    Objection to the form. That wasn't what the question was.

A.     Can you say that again?

Q.     Now, that you reviewed this document?

A.     Okay.

Q.     Does it help you remember whether or not there was an internal affairs investigation?

A.     I know I was interviewed by internal affairs about it.  I didn't know there was an investigation.

Q.     Did you draft this statement?

A.     Yes, I did.

Q.     Do you remember being interviewed by internal affairs?

A.     I don't recall being interviewed

Case 2:15-cv-05686-NR-MRG-LGD Document 281-1 Filed 07/17/23 Page 57 of 90 PageID #: 10998

KEVIN FLAHERTY

about it.  It is almost ten years ago.

Q.      Have you been involved in any other internal affairs investigations?

A.      Regarding this incident, not that I know of.

Q.      Regarding any incident?

A.      I'm not sure what you're asking.

Q.      Have you ever been interviewed by internal affairs other than for the purpose of giving this statement?

A.      For this incident?

Q.      For any incident were you involved?

A.      Yes, in my career I have been interviewed by internal affairs.

Q.      How many time have you been interviewed by internal affairs?

A.      I don't recall offhand.

Q.      Was it once a year?

A.      No, no.

Q.      Once every five years?

A.      Yeah, I would say that's more accurate, yes.

Q.      Was it more common when you

Case 2:15-cv-05686-NR-MRG-LGD Document 281278-1 Filed 07/17/23 Page 58 of 590 PageID #: 26111999

KEVIN FLAHERTY

were a sergeant then when you were a corrections officer?

A.    No.  It was probably more common as a CO then as a sergeant.

Q.    Do you remember any of the other times that you were interviewed by internal affairs?

A.    Not off the top of my head.

Q.    Do you recall what the circumstances would have been when you were interviewed by internal affairs?

A.    I would assume a complaint.

Q.    Do you know what those complaints would have been about?

A.    Not offhand, no.

Q.    For example, did they involve inmates complaining that they were the target of excessive force by officers?

A.    Not that I can recall.

Q.    Have you ever reported another officer to internal affairs?

A.    No, I have not.

Q.    Have you ever provided a statement in support of an inmate's allegation

Case 2:15-cv-05685-NR-MRG-LGD Document 281-1 Filed 07/17/23 Page 59 of 90 PageID #: 12000

KEVIN FLAHERTY

of excessive force?

A.      No, I have not.

Q.      Have you ever witnessed an officer use excessive force against an inmate?

A.      No, I have not.

Q.      Have you ever heard of an inmate complaining of excessive force being used against them by an officer?

A.      No.

Q.      Have any of your colleagues been disciplined for using excessive force against an inmate?

A.      Not that I know of.

MR. CHOW:   We have been going for a little over an hour, let's take a 10 minute break.

MR. WOOD:   Sure.

THE VIDEOGRAPHER:   Going off the record the time is 11:27 a.m.  This is the end of media unit 1.

(Recess Taken.)

THE VIDEOGRAPHER:   We are back on the record, the time is 11:40 a.m. this is the beginning of media unit 2.

Case 2:15-cv-05568-NR-MRG-LGD Document 281-18-1 Filed 07/17/23 Page 60 of 90 PageID Page ID #: 2613001

KEVIN FLAHERTY

BY MR. CHOW:

Q.     Mr. Flaherty, why did you decide to become a sergeant?

A.     I took the test, I scored well and wanted to progress in my career.

Q.     Were there any prerequisites to being a sergeant?

A.     You had to be an officer with the Suffolk County Sheriff's Office Corrections Division.  I believe at the time you had to serve at least two years to be eligible to take the test.

Q.     Once you became a sergeant, did you have to undergo any special training?

A.     Yes, we went through supervisor training.

Q.     What is supervisory training?

A.     You went to the academy, we were basically there was a lot of report writing, procedures at the time, this is going back to 2004, so my recollection isn't the greatest about it.  We had a lot of senior sergeants come in and talk to us about their experiences and bring us up to speed on the O and Ps of the

Case 2:15-cv-05685-NR-MRG-LGD Document 281278-1 Filed 07/17/23/23 Page 61 of 90 Page ID Page ID #:614002

KEVIN FLAHERTY

sheriffs department.

Q.      What do you mean by Os and Ps?

A.      Operations and procedures.

Q.      Other than that initial training at the academy, would you take any other supervisor trainings after the first training that you received?

A.      At the academy, no.

Q.      What about not at the academy?

A.      At one point they had us taking some computer courses.  That was for a brief time and then they phased that out.

Q.      So when you became a sergeant and you were also a member of the SERT team, did you have to take any SERT specific training in your role as a sergeant?

A.      No, not that I recall.

Q.      How often would you receive SERT training?

A.      Once a month at best.

Q.      What would those trainings consist of?

A.      They would consist of everything that we did as a SERT team.  We would go over

Case 2:15-cv-05688-NR-MRG-LGD Document 281-1 Filed 07/17/23 Page 62 of 90 PageID Page #: 26152003

KEVIN FLAHERTY

defensive tactics, cell extractions, handcuffing, we would review incidents that happened in the facility with the reports, talk about the different incidents, different tactics that we would use and critique them.

Q.    Were you trained on the use of the emergency restraint chair?

A.    Yes, I was.

Q.    Was that as part of your SERT training?

A.    It was part of training as a regular crew sergeant and then as SERT, yes, we did go over the restraint chair.  The workings of the restraint chair and procedure.

Q.    Were you regularly trained on the use of the restraint chair?

A.    No, just the initial time and then, you know, we used it.

Q.    Mr. Flaherty, what is an inmate grievance?

A.    What is an inmate grievance?

Q.    Yes.

A.    I guess -- I'm not exactly sure what you mean by a grievance.

Case 2:15-cv-05568-NR-MRG-LGD Document 281-1 Filed 07/17/23 Page 63 of 90 PageID Page #: 26162004

KEVIN FLAHERTY

Q.    Do you know whether inmates could make complaints regarding their treatment through a grievance form?

A.    They could grieve things with a grievance form or they can call internal affairs.

Q.    Were you ever responsible for collecting inmate grievances?

A.    Yes.

Q.    Were you responsible for reviewing inmate grievances?

A.    Yes.

Q.    Were you responsible for resolving inmate grievances?

A.    As a floor sergeant and as a zone sergeant, yes, because the inmate would file a grievance, he has a grievance form and that grievance would go to me to see if I could resolve the inmate's grievance.  And if I do resolve it or if I didn't resolve it that would be noted on the grievance form and then that grievance form would be forwarded to the grievance coordinator.

Q.    Would inmates make grievances

Case 2:15-cv-05686-SR-MRLGDDocument 281278-1FiledFiled07/17/263/2Page 64 of 690Page ID Page#I26172005

KEVIN FLAHERTY

against individual officers?

A.     Not that I'm aware of.

Q.     Did you ever see whether an inmate made a grievance about the use of excessive force against that inmate?

A.     No, I haven't.

Q.     What is the process for an inmate submitting a grievance?

A.     If the inmate has an issue, he will obtain a grievance form from the housing officer.  The inmate will fill out the grievance form. What he is grieving and then the officer will write on his section what steps he has done to solve this grievance.  If he can't, he will write down whether he can or can't and that will be forward to the floor sergeant or the zone sergeant.

Then I would put down what I did to solve this or whether we did or didn't.  I would fill out my part of the form and it would go to the grievance coordinator.

Q.     Do you know whether all grievance forms are retained?

A.     I have no idea.

Case 2:15-cv-05685-NR-MRG-LGD Document 281-1 Filed 07/17/23 Page 65 of 90 PageID Page #: 26186

KEVIN FLAHERTY

Q.    If an officer did have a complaint about the use of excessive force, do you know how they would go about making that complaint?

A.    I assume they would call internal affairs.

Q.    At any time whether during or after the incident, did you ever see or hear from Mr. McClurkin that he had complained about excessive force?

A.    No.

MR. CHOW:  Can we take a five-minute break?

MR. WOOD:   Sure.

THE VIDEOGRAPHER:  Going off the record the time is 11:49 a.m.

(Recess taken.)

THE VIDEOGRAPHER:   We are back on the record, the time is 11:52 a.m.

MR. CHOW:   Thank you very much for your time today, Mr. Flaherty, we have no further questions for you.

THE WITNESS:   Thank you.

MR. WOOD:    Thank you.

THE VIDEOGRAPHER:    We are off the

Case 2:15-cv-05685-MRP-JC Document 281-1 Filed 07/17/23 Page 66 of 90 Page ID #:12007

KEVIN FLAHERTY

record at 11:52 a.m. and this concludes
today's testimony given by Kevin Flaherty.
The total number of media used was 2 and
will be retained by Veritext.

(TIME NOTED:  11:52 A.M.)

Case 2:15-cv-05686-NR-MRG-DGD Document 281-1 Filed 07/17/23 Page 67 of 90 PageID Page #: 2620

C E R T I F I C A T E

STATE OF NEW YORK          )

                          : ss.

COUNTY OF NEW YORK         )

        I, WILLIAM VISCONTI, a Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify:

        That prior to being examined, the witness named in the foregoing deposition was duly sworn to testify the truth, the whole truth, and nothing but the truth;

        That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced by me to typewritten form and that the same is a true, correct, and complete transcript of said proceedings.

        Before completion of the deposition, review of the transcript [ ] was [ ] was not requested.  If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

        I further certify that I am not interested in the outcome of the action.

        Witness my hand this 17th day of December, 2025.

_____

WILLIAM VISCONTI

                    E X H I B I T S

DESCRIPTION                              PAGE

  (Plaintiff's Exhibit 1 for            28

  identification, Incident

  Report.)

  (Plaintiff's Exhibit 16 for           54

  identification, Mr. Flaherty's

  statement to internal affairs

  dated 10/5/16.)

Case 2:15-cv-05686-NR-MRG-LGD Document 281278-1 Filed 07/17/2013/23 Page 69 of 690 PageID Page ID #: 2622 2010

BRYAN MC CLURKIN vs. SUFFOLK COUNTY, et al.

12/8/2025 - KEVIN FLAHERTY

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____        _____

KEVIN FLAHERTY                              Date

Case 2:15-cv-06568-NR-MRG-LGD Document 281-1 Filed 07/17/23 Page 70 of 90 PageID #: 2623

BRYAN MC CLURKIN vs. SUFFOLK COUNTY, et al.

12/8/2025 - KEVIN FLAHERTY

ACKNOWLEDGEMENT OF DEPONENT

I, KEVIN FLAHERTY, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted on the Errata to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____      _____

KEVIN FLAHERTY                               Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

_____ DAY OF _____, 20____.

_____

NOTARY PUBLIC

[& - affairs]                                                                    Page 1

| & | | | |
|---|---|---|---|
| **&** | | | |
| **&**  2:2 5:13,16 6:8 | **17th**  67:22 | **28**  68:4 | **96**  15:22 |
| | **1988**  15:18 | **2:15**  1:4 4:22 | **98**  15:23,24 |
| **0** | **1989**  16:20 17:4 | **3** | **a** |
| **05685**  1:4 4:22 | **1990**  17:6,9 | **30**  1:20 | **a.m.**  1:15 4:3 59:20,24 65:16 65:19 66:2,6 |
| **1** | **1990s**  8:15 | **4** | |
| **1**  1:20 28:2,3 59:21 68:4 | **1993**  17:4 | **4**  33:5,17,23,24 40:4,5 | **ability**  11:24 |
| **1/2**  17:19 | **1994**  17:9,16 | | **able**  9:14,22 40:8 48:18 50:3 52:22 |
| **10**  59:16 | **1997**  22:4 | **45**  29:22 | |
| **10/5/16**  55:3,22 68:10 | **2** | **5** | **above**  24:3,4 32:7,22 45:12 |
| **100**  2:10 6:16 | **2**  17:19 59:25 66:4 | **5/8**  46:15 56:3 | |
| **10018-1495**  2:4 | **20**  18:18 70:15 | **5/8/2015**  29:6 56:9 | **academy**  17:7 60:19 61:6,9 61:10 |
| **10:01**  1:15 | **2000s**  7:11 | **54**  68:7 | |
| **10:10**  4:3 | **2001**  16:9 17:16,17,21 | **5th**  2:10 | **access**  9:3 |
| **1112**  1:11 | **2003**  17:20 | **6** | **accurate**  30:6 57:24 |
| **11788**  2:10 | **2004**  17:21,24 18:3,8 60:22 | **600**  19:6,12 | **acknowledge...** 70:3 |
| **11901**  6:17 | **2013**  18:9 19:5 | **620**  2:3 33:5 | **action**  5:3 67:21 |
| **11:27**  59:20 | **2014**  18:14 | **65**  19:6,11 | |
| **11:40**  59:24 | **2015**  19:5 24:11 26:8 | **7** | **actions**  23:20 24:19 25:3,6 |
| **11:49**  65:16 | **2016**  20:19 21:19 | **7**  39:20,24 40:11,12 49:13 | **actually**  24:17 |
| **11:52**  65:19 66:2,6 | **2020**  16:10 | **710**  33:20 | **add**  40:18 |
| **12**  17:7 | **2021**  16:11,12 18:4,15 | **8** | **additions**  70:6 |
| **12/8/2025**  69:2 70:2 | **2025**  1:14 4:4 67:22 | **8**  1:14 26:8 47:7 | **address**  6:15 |
| **1225**  1:10 | **20567**  67:24 | **8th**  4:4 53:2 | **administer** 3:13 |
| **1337**  1:10 | **25**  18:19 | **9** | **affairs**  54:18 55:3,16,18 56:8,17,19,24 |
| **15**  40:19,23 | | **9**  33:12 | |
| **16**  54:22,25 68:7 | | **90**  40:6 | |
| | | **90s**  6:24 | |

Case 2:15-cv-05698-NR-MRG-LGD Document 81-1 Filed 07/17/23 Page 72 of 90 PageID Page ID #: 2625 2013

57:4,10,16,18
58:8,12,22
63:7 65:6 68:9
**affiliations** 5:9
**ago** 57:2
**agree** 4:13
**agreed** 3:2,6,10
**al** 4:19 69:1
70:1
**alcohol** 12:5
**allegation**
58:25
**allegations**
7:24
**allowed** 67:19
**ankles** 44:19
**answer** 12:15
12:18,20,24,25
13:3,15,16,24
44:3,4 45:21
49:17
**answering** 13:2
**answers** 11:13
11:21 12:2,7
12:23
**anybody** 10:20
**aparna** 2:6
5:15 27:24
54:20 55:4
**appear** 50:21
**appearance** 5:7
**appearances**
5:9

**appended**
67:19 70:7
**applications**
9:24
**applied** 26:3
43:15 51:16
**apply** 36:24
**applying** 51:8,9
51:24
**april** 18:9,14
**arce** 34:16 35:5
35:15,17,18
37:25
**area** 22:23 30:3
33:10 48:24
49:10,11
**areas** 18:25
54:6
**arm** 34:17,17
35:22 36:3,6
36:14,16
**arms** 44:20,25
52:2,17
**articulated**
50:19
**asking** 39:4
57:8
**assault** 7:16,19
7:25 8:7,9,10
**assembled**
25:24 34:15
37:15 39:15
**assessment**
46:5

**assign** 24:5,7
**assigned** 18:8
19:4 31:8,8
34:22 35:19
36:8,13,19
37:7
**assignment**
47:19
**assume** 13:10
58:13 65:5
**asundaram** 2:6
**attached** 44:18
**attend** 14:25
**attending** 5:8
**attention** 52:25
**attorney** 5:11
5:13 6:7 8:25
13:13 14:4,6
**attorney's** 5:19
**attorneys** 2:3,9
3:3
**audibly** 12:24
13:3
**audio** 4:11
**authorized**
3:12
**available** 39:9
39:16
**avenue** 2:3
**aware** 53:3
54:7,11,14
64:3

**b**

**b** 1:20 68:2
**back** 22:4
38:13 43:7,8
43:10 44:11,15
44:21,22 51:13
52:14 59:23
60:21 65:18
**backward** 50:5
51:10 52:12
**backwards**
52:11
**banging** 33:23
**bars** 24:22
**based** 23:20
25:5
**basically** 20:8
28:23 31:22
44:8 52:20
60:20
**bates** 54:23
**bathroom**
42:10
**bearing** 54:23
**beginning** 5:10
34:14 38:10
47:9 59:25
**behalf** 5:14,20
**behavior** 33:21
**believe** 6:20,22
8:24 34:11
42:8,9 47:7
52:6 54:20,22

Case 2:15-cv-05685-NR-MRG-LGD Document 281-1 Filed 07/17/23 Page 73 of 90 PageID #: 2626

60:11
**belt** 44:13
**bent** 45:2
**best** 61:21
**beyond** 26:23
27:2
**bigger** 40:7,7
**bit** 18:23
**bizarre** 33:22
**blow** 35:4
**body** 44:8,9
**booking** 31:9
33:5,17,18
39:20,23 40:11
40:11 49:10
53:10
**bowry** 2:16
4:23
**break** 13:19
59:17 65:13
**brief** 23:14
61:12
**bring** 60:25
**broken** 46:5
**brought** 39:15
**bryan** 1:6 4:18
5:14 6:9 26:19
69:1 70:1
**bunch** 54:6
**bureau** 2:9
**burling** 2:2
5:13,16 6:8

**c**

**c** 2:2 67:1,1
**c.w.** 15:6,10,14
15:23
**call** 23:24
35:10 63:6
65:5
**called** 34:5,9
**camera** 4:8
41:10,16,23
42:3,6 45:10
45:11,12,16,18
45:24 49:5
**cameras** 41:25
45:10,12
**capacity** 1:9
**capture** 42:3,11
42:13
**captured** 42:16
42:20,23 43:2
43:12,13 45:5
45:8,11
**career** 57:15
60:6
**case** 1:4 4:21
6:25 7:15
**catch** 52:22
**ceiling** 45:13
**cell** 21:6,8
22:16,19 23:21
23:22 24:21,22
25:6 33:12,23
33:24 35:2

36:4,5 37:17
38:14,22 39:6
39:7,10,12
40:5,6,7,9,11
42:7,12,14,15
42:24 43:4,5,7
43:9 45:23
46:2,7,10 49:4
49:23 50:4
52:8 62:2
**center** 6:16
**certify** 67:7,20
**chair** 25:16,23
26:2,6 37:17
38:15,25 39:2
39:5,10,15,18
40:4,8,13,20
41:12,24 43:10
43:12,14,19,24
43:25 44:6,10
44:12,15,23,24
44:25 49:13
50:5,17 51:13
51:14 53:7
62:8,14,15,17
**change** 69:4,7
69:10,13,16,19
**changed** 40:25
**changes** 67:18
70:6
**charge** 30:3
31:5
**charles** 1:9,10
30:18,22 31:6

31:7,10 32:12
32:14
**chat** 8:22 10:5
**chats** 9:24
**checked** 39:19
40:22,24 41:15
49:7
**checking** 9:5
37:4
**chow** 2:5 5:12
5:12 6:5,7
27:24 28:10
54:20 59:15
60:2 65:12,20
**circumstances**
58:11
**clarify** 13:9
**clearly** 10:14
**clue** 27:20
**clurkin** 1:6
69:1 70:1
**colleague** 5:15
**colleagues**
59:11
**collecting** 63:9
**college** 15:2,4,5
15:12,20,21
**come** 20:10
60:24
**comes** 10:23
32:4,9 44:9
**committed**
12:25

Case 2:15-cv-05635-SDW-LDG Document 281-1 Filed 07/17/23 Page 74 of 90 PageID Page ID #: 2627 2015

**common** 21:13
21:14 25:9,11
25:13 27:6
57:25 58:4
**communication**
10:10
**community**
15:5,12,20,21
**complained**
65:9
**complaining**
58:18 59:8
**complaint**
58:13 65:2,4
**complaints**
40:22 50:18
58:14 63:3
**complete** 11:13
11:20 12:14
67:14 70:9
**completed**
29:23
**completion**
67:16
**compliant** 33:4
49:21 52:4
**complied** 25:15
38:18,19 49:20
49:23 50:2
**complies** 24:19
36:22 51:22
**comply** 24:24
24:25 25:10,14
46:2,7

**complying**
42:21
**computer** 9:18
9:21,25 10:12
61:12
**concerning**
26:15 30:10
**concludes** 66:2
**condition** 40:25
**conducted** 4:6
6:5
**confirm** 9:17
9:23 10:8 30:6
**connection** 4:9
**consist** 61:22
61:24
**consistent**
37:22 38:2,5
**consisting**
34:15 37:24
**consumed**
11:23
**contact** 50:24
51:5,7
**contemporan...**
47:2
**continue** 4:12
**convenient**
13:21
**coordinator**
63:24 64:22
**correct** 15:24
16:13 67:14
70:8

**correction** 1:9
17:12
**corrections**
14:14 16:17,23
16:25 17:15
20:9,16,18
22:25 23:7
27:15 58:3
60:10 70:6
**cos** 34:16 38:14
43:2,17
**counsel** 4:17
5:8,17,24 9:19
10:11 26:25
**county** 1:9 2:8
4:19 5:18,19
5:20 7:5,12,17
16:16,19,22
28:21 60:10
67:4 69:1 70:1
**courses** 61:12
**court** 1:2 3:15
4:20,25 5:22
7:7,12 11:7
12:11,22
**cov.com** 2:5,6
**covington** 2:2
5:13,16 6:8
**crew** 17:11,13
17:15 18:9
19:5,5,6,11
31:5,8 34:22
35:19 36:9,13
36:19 37:8

62:13
**critique** 62:6
**cuff** 23:22
**cuffed** 44:11,14
44:21 51:21
**currently** 16:4
**cv** 1:4 4:22

**d**

**d** 30:25
**date** 29:3 55:22
69:24 70:12
**dated** 55:3
68:10
**day** 31:5 55:20
67:22 70:15
**deal** 20:9 23:19
**december** 1:14
4:4 67:22
**decide** 21:20
60:3
**decision** 23:23
23:25 24:2
25:2,5
**decisions** 53:24
54:4
**declare** 70:4
**deemed** 70:6
**defendants**
1:12 2:9 5:18
5:21
**defensive** 62:2
**degrees** 40:6

Case 2:15-cv-05685-NR-MRG-LGD Document 281-1 Filed 07/17/23 Page 75 of 90 PageID Page ID #: 2628

**delivers** 35:4

**department** 2:8 16:17 28:21 61:2

**depended** 23:6

**dependent** 24:18

**depending** 54:5

**depends** 4:7

**deponent** 67:18 70:3

**deposition** 1:18 3:11 4:5,16 6:19 8:11,15 8:18,24 10:24 14:3,11,15,18 67:9,11,16

**deputy** 27:7

**described** 29:18 30:13

**description** 30:7,9,12 37:23 68:3

**determination** 23:20

**different** 8:13 8:16 18:24,24 20:10 54:6 62:5,5

**direct** 41:12 47:5

**directed** 43:6

**directs** 8:23 13:15

**discipline** 19:20

**disciplined** 19:18 59:12

**discomfort** 50:21

**discussed** 14:11

**dislocated** 54:12

**district** 1:2,3 4:20,21

**division** 16:17 60:11

**document** 27:25 28:14,19 28:22 29:7 30:17,22 53:20 54:23 55:11,13 56:6,14

**documents** 10:16 14:17,20 14:21

**donahue** 34:18 37:6,7 38:2 46:16

**door** 24:22 39:7 40:7 43:5

**double** 36:25 37:5 39:19 43:16

**download** 9:7 9:14

**draft** 29:10,12 32:14 56:21

**drafted** 29:3 30:12,18,22 31:11

**drafting** 32:11

**drafts** 32:12

**drive** 6:16

**drugs** 12:5

**duly** 6:3 67:9

**duties** 18:16

**duty** 19:10,15 26:11 31:4 32:23 34:7,9 47:10,17 48:3

**e**

**e** 2:2,2 6:2,2 9:24 10:6 67:1 67:1 68:2 69:3 69:3,3

**earlier** 45:4

**early** 17:21

**eastern** 1:3 4:20

**education** 16:2

**effect** 3:14

**eighth** 2:3

**either** 24:21

**electronic** 10:9

**eligible** 60:12

**emergencies** 22:21

**emergency** 19:24 20:7 25:16,22 62:8

**employed** 16:4

**encounter** 51:2 53:2

**encountered** 27:19,21

**engaging** 35:11

**ensued** 56:8

**enter** 23:21 25:6 35:2 36:3 36:5 46:2 49:22

**entire** 18:6 37:20 40:13 42:4 48:10

**entry** 20:9

**errata** 70:7

**escort** 26:4

**esq** 2:5,6,11

**esu** 22:15

**et** 4:19 69:1 70:1

**evaluated** 50:16,20 53:6

**event** 30:13 38:3 42:4

**events** 30:5

**everybody** 23:16

**everyday** 28:25

**ewald** 1:9

**exact** 7:22

**exactly** 62:24

**examination** 6:5

Case 2:15-cv-05585-NR-MRG-LGD Document 281-18 Filed 07/17/23 Page 76 of 90 PageID Page ID #: 2017

| | | | |
|---|---|---|---|
| **examined** 6:4 67:8 | **f** | **first** 6:3 16:21 16:23 21:25 | 64:1 65:1,21 66:1,3 69:2,24 |
| **example** 39:12 58:17 | **f** 6:2 67:1 **facility** 7:19 | 27:18,19,20 31:25 32:12,18 | 70:2,4,12 **flaherty's** 55:2 |
| **except** 3:7 | 16:24 17:8,12 | 40:19 61:7 | 68:8 |
| **excessive** 58:19 59:2,5,8,12 | 18:6,8,10,14 20:11 21:3,5 | **fit** 26:3 37:5 39:19 43:15 | **floor** 2:10 63:16 64:17 |
| 64:5 65:3,10 | 26:22 28:25 | **five** 20:25 23:4 | **folder** 9:12,13 |
| **exchange** 8:8 | 33:11 35:20 | 57:22 65:13 | 55:5 |
| **exhibit** 8:24 9:4 | 36:12,19 37:8 | **flaherty** 1:19 | **followed** 41:5,7 |
| 9:6,13,14,17,20 | 42:2 49:8 | 4:17 6:6,13,18 | **follows** 6:4 |
| 28:2,3 54:21 | 53:12 62:4 | 7:1 8:1,11 9:1 | **food** 38:13 |
| 54:22,25 55:5 | **fact** 45:7 | 10:1 11:1,2 | 42:17 51:17,21 |
| 68:4,7 | **fairly** 21:14 | 12:1 13:1 14:1 | **footage** 45:16 |
| **exhibits** 9:9,11 | **fall** 51:12 52:15 | 14:2,25 15:1 | 45:19,24 |
| **exit** 23:22 | **falling** 52:22 | 16:1 17:1 18:1 | **force** 3:13 |
| **experience** 24:15 | **far** 23:18 46:5 | 19:1,17,23 20:1 21:1 22:1 | 24:17,20 25:2 25:11 46:3 |
| **experiences** 60:24 | **feces** 33:24 49:18 | 23:1 24:1 25:1 26:1 27:1 28:1 | 58:19 59:2,5,8 59:12 64:6 |
| **explanatory** 20:6 | **federal** 2:9 **feed** 10:3 | 28:5,15 29:1 30:1 31:1 32:1 | 65:3,10 **foregoing** 67:9 |
| **extent** 8:14 | **field** 30:17,24 | 32:3 33:1,25 | 70:5 |
| **extraction** 8:6 | **fight** 49:22 | 34:1 35:1 36:1 | **form** 3:7 26:17 |
| 8:10 23:10,12 | **file** 63:17 | 37:1 38:1 39:1 | 26:24 28:17 |
| 24:8 34:6,10 | **filed** 4:19 | 40:1 41:1 42:1 | 29:2,11,25 |
| 34:15 37:15 | **filing** 3:4 | 43:1 44:1 45:1 | 44:2 45:20 |
| 38:22 42:24 | **fill** 64:12,21 | 46:1 47:1 48:1 | 49:16 56:10 |
| 45:24 46:8,11 | **filming** 37:17 | 49:1 50:1 51:1 | 63:4,6,18,22,23 |
| 50:8 | **finance** 15:13 | 52:1 53:1 54:1 | 64:11,12,21 |
| **extractions** | 15:16 | 55:1,9,14 56:1 | 67:13 |
| 21:6,8 22:17 | **financially** 5:4 | 57:1 58:1 59:1 | **forms** 45:8 |
| 22:19 62:2 | **fine** 28:10 **firm** 6:8 | 60:1,3 61:1 62:1,20 63:1 | 64:24 |

Case 2:15-cv-05686-NR-MRL-GD Document 281-1 Filed 07/17/23 Page 77 of 90 PageID Page #: 2630 2018

**forward** 64:17
**forwarded** 63:23
**found** 8:4
**four** 15:6 17:3 17:8
**friday** 14:7 29:8
**front** 10:6,12 10:16 11:7 55:6
**full** 6:11,12 11:13,20 12:7 12:19
**further** 3:6,10 53:21 65:22 67:20

**g**

**gate** 37:2
**gesturing** 13:2
**give** 12:17
**given** 24:25 33:4 36:5,23 38:11,20 41:13 41:14 50:3 66:3 70:9
**giving** 57:11
**go** 4:13 12:10 15:4 23:17 26:5 28:18 30:16 34:12 38:9 47:6 61:25 62:14

63:19 64:22 65:4
**goal** 25:14
**goes** 32:23 35:13 40:19
**going** 4:3 14:20 23:15 45:11 54:21 59:15,19 60:21 65:15
**good** 4:2 6:6 28:18
**graduate** 15:17 15:19
**greatest** 60:22
**grievance** 62:21,22,25 63:4,6,18,18,19 63:20,22,23,24 64:5,9,11,12,15 64:22,23
**grievances** 63:9 63:12,15,25
**grieve** 63:5
**grieving** 64:13
**ground** 8:13 12:9 52:23
**guess** 28:12 43:24 44:21 53:22 62:24
**guide** 51:13 52:13
**guided** 43:10 52:17,19

**guilty** 8:4

**h**

**h** 6:2 68:2 69:3
**half** 29:22
**hand** 51:23,23 67:22
**handcuff** 50:4
**handcuffed** 38:12 42:17
**handcuffing** 62:2
**handcuffs** 24:20 36:24 44:11 51:9,16
**handheld** 37:10 45:6,10 46:12 46:14
**handhelds** 41:11,17
**handle** 22:20
**hands** 44:14 51:19
**happauge** 1:21 2:10
**happen** 8:7 21:16,18
**happened** 30:3 30:9 47:23 48:7 53:8 62:3
**happening** 8:12 48:19
**happens** 28:24

**head** 7:3 13:2 26:9 53:15 55:25 58:9
**hear** 15:8 65:8
**heard** 4:10 59:7
**hearing** 8:19
**held** 52:16
**help** 56:16
**hereto** 67:19 70:8
**highway** 2:10
**hold** 52:2
**holding** 49:4
**hooked** 44:12 44:15
**hour** 14:10 29:22 59:16
**hours** 33:6,20
**housed** 33:3,8
**housing** 18:20 18:24 22:23 33:10,11,14 64:11

**i**

**idea** 64:25
**identification** 28:4 55:2 68:5 68:8
**immediately** 29:19,21 39:9
**impair** 11:24
**incident** 26:15 26:16,24 27:2

Case 2:15-cv-05686-NR-MRG-LGD Document 281-18-1 Filed 07/17/26 3/20 Page Page 78 of 90 of 90 PageID Page ID 2631 2019

27:22 28:4,20
29:10,14,18,23
29:25 30:3,10
36:9 37:11,12
37:14,18 39:14
39:16 40:16
41:3 45:5
46:15,17,19
47:4,24 48:6
48:11,12,23
49:2,15 50:6
51:6 53:5 54:9
56:3,9 57:5,7
57:12,13 65:8
68:5
**incidents** 62:3
62:5
**included** 53:16
**including** 33:22
**incoherent**
33:22
**indicate** 9:7
35:24 50:13,15
**indicates** 35:25
**individual** 64:2
**influence** 12:4
**information**
33:4
**initial** 6:13
8:17 12:12
61:5 62:18
**initialed** 32:6
32:20

**initials** 31:16
**injure** 51:12
52:15
**injured** 50:14
50:16
**injuries** 21:21
21:22 40:21
50:19 54:15
**inmate** 7:25 8:4
22:21 23:19,21
24:17,19,21,22
24:24 25:10,12
25:13,15,22,25
26:5,21 27:10
27:16 33:2,21
35:2,4,12 36:4
36:16,22,22,24
37:4,16,20
38:12 39:9
40:3,8,19,23
41:11,15 43:7
43:25 45:25
46:7 49:4,6,12
51:22 52:14,14
53:5,24 54:5
59:5,7,13
62:20,22 63:9
63:12,15,17
64:4,6,8,10,12
**inmate's** 23:20
24:19 25:3,6
35:13 58:25
63:20

**inmates** 18:19
19:7,12 22:23
42:10 58:18
63:2,25
**inside** 42:6
**interested** 5:4
67:20
**internal** 54:18
55:3,15,18
56:8,17,19,24
57:4,10,16,18
58:7,12,22
63:6 65:5 68:9
**internet** 4:8
**interviewed**
56:18,23,25
57:9,16,18
58:7,12
**introduce**
27:25 54:21
**investigation**
54:18 56:8,17
56:20
**investigations**
54:15 57:4
**involve** 58:17
**involved** 21:4
21:20,25 48:14
48:19,20,22
53:23 54:6
57:3,14
**involvement**
21:23

**island** 15:6
22:14,15
**issue** 64:10
**issues** 42:9

| j |
|---|

**january** 15:22
16:9,12 18:4
18:15
**joining** 22:7
**judge** 11:7

| k |
|---|

**k** 6:2
**kchow** 2:5
**kevin** 1:19 4:16
6:12 7:1 8:1
9:1 10:1 11:1
12:1 13:1 14:1
15:1 16:1 17:1
18:1 19:1 20:1
21:1 22:1 23:1
24:1 25:1 26:1
27:1 28:1 29:1
30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1 40:1 41:1
42:1 43:1 44:1
45:1 46:1 47:1
48:1 49:1 50:1
51:1 52:1 53:1
54:1 55:1 56:1
57:1 58:1 59:1
60:1 61:1 62:1

Case 2:15-cv-05685-NR-MRG-LGD Document 281278-1 Filed 07/17/23/2 Page 79 of 90 PageID Page ID #2632020

| | | | |
|---|---|---|---|
| 63:1 64:1 65:1 66:1,3 69:2,24 70:2,4,12 | **law** 2:8 6:7 | **liu** 15:10 | 38:14 43:3,8 43:17,22 52:7 52:7 |
| **kind** 49:19 53:4 | **lead** 38:13 | **llp** 2:2 5:13 | **maiorino's** 36:2 |
| **knew** 56:7 | **leading** 43:3 | **located** 1:20 39:2,11,14 | **make** 12:11 23:19 25:5 36:24 40:21,24 50:24 51:11 52:2 55:20 63:3,25 |
| **know** 8:20 9:2 10:24 13:6,8 13:20 14:23 19:23 22:8 26:10,19,21 27:11 28:6,15 29:15 33:13,17 33:19 35:15 38:25 39:13,23 45:9 48:4,16 48:21,22,23 51:5,19 53:8 53:13 54:3,17 55:8,13 56:2 56:18,19 57:6 58:14 59:14 62:19 63:2 64:23 65:3 | **led** 52:8,10 | **locked** 36:25 39:19 43:16 |  |
|  | **lee** 2:16 4:23 | **locker** 47:10,16 |  |
|  | **left** 34:17 35:22 36:3,6 | **locking** 37:5 |  |
|  | **leg** 35:11,12 37:3 44:7,16 44:16 51:9,11 52:13 | **log** 9:13 |  |
|  |  | **login** 9:20 | **makes** 54:3 |
|  | **legs** 34:16 35:6 35:9,13,14 | **long** 14:8 15:6 16:25 17:14 18:2,11 | **making** 26:2 28:8 52:20 55:23 65:4 |
|  | **leisure** 9:15 | **look** 9:22 36:21 | **man** 23:4 |
|  | **level** 20:9 | **looked** 46:4,22 46:23 | **management** 15:13,16 |
|  | **li** 15:14 | **looking** 40:5,5 42:14 | **marked** 27:25 |
|  | **lieutenant** 23:8 23:8 24:4,7,9 30:25 31:3,4 32:15,24 34:8 34:9 48:3 | **looks** 44:9 | **mass** 22:21 |
|  |  | **lot** 60:20,23 | **matter** 4:18 6:9 8:17 12:12 |
|  |  | **lrd** 1:4 4:22 | **mc** 1:6 69:1 70:1 |
| **kyle** 2:5,11 5:12,18 6:7 9:5 55:7 | **lieutenant's** 47:11,17 | **m** | **mcclurkin** 4:18 5:14 6:9 26:20 27:2,8,8,15,19 27:21 33:3 38:12,18 39:17 40:9 41:6,23 42:17,21 49:12 49:15 50:9,25 51:6 52:25 53:9 54:7 56:4 |
| **kyle.wood** 2:12 | **lieutenants** 19:16 | **m** 6:2,13 36:10 |  |
| **l** | **likewise** 12:17 | **made** 23:16 51:5,8 55:17 64:5 67:18 70:5 |  |
| **l** 6:2 | **line** 34:12,14 38:10 47:8 69:4,7,10,13,16 69:19 | **mail** 9:24 |  |
| **large** 22:22 | **lines** 38:9 47:7 | **mails** 10:6 |  |
| **larger** 28:8 | **link** 8:22 9:3 | **main** 49:10 |  |
| **late** 6:24 17:21 | **little** 8:13,16 18:23 59:16 | **maiorino** 1:11 34:16 35:21 36:6,7 37:25 |  |

Case 2:15-cv-05686-NR-MRG-LGD Document 281-1 Filed 07/17/23 Page 80 of 90 PageID #: 2633

65:9
**mcclurkin's**
33:21 54:15
**mckenna** 30:25
31:3
**mean** 20:3
34:24 35:8
37:9 61:3
62:25
**means** 10:9
37:10
**measure** 22:24
**media** 4:15
59:21,25 66:4
**medical** 22:21
33:11,13 40:20
40:21,24,25
49:7 50:18
52:25 53:4,6
**medication**
38:11 49:21,25
**meet** 14:5,8
**member** 61:15
**memorial** 2:10
**mentioned**
17:23 45:4
52:10
**message** 9:24
**met** 14:4 43:9
**michael** 1:10
6:13
**mid** 6:24
**middle** 6:12
28:12

**midnight** 17:2
**midnights**
16:24 17:8
**midway** 34:13
**minute** 41:15
59:16 65:13
**minutes** 29:22
40:19,23
**moment** 13:21
55:9
**month** 21:15,17
61:21
**months** 21:18
**morning** 4:2
6:6
**move** 36:23
39:9,20 52:2
**moved** 33:5,16
33:18 53:9
**movement**
22:22
**moving** 22:22

| n |
| --- |

**n** 2:2 6:2
**name** 4:23 6:7
6:11,12,13
27:3,5,6,7
**named** 5:21
67:8,12
**narrative** 31:22
**necessary** 70:7
**need** 13:19
25:11 46:8

**new** 1:3,21,23
2:4,10 4:21,24
6:16 7:21 67:2
67:4,6
**noncompliant**
36:4
**normal** 28:24
**notary** 1:22 6:3
67:6 70:13,19
**note** 4:5 33:2
**noted** 63:22
66:6 70:7
**notice** 1:20
**noticing** 5:10
**notified** 32:3
32:18 34:7
**november** 18:3
18:8
**nrm** 1:4 4:22
**number** 4:21
21:10,11 22:22
31:17 32:6,21
33:5,12,17,23
33:24 39:20,24
40:4,5,12
49:13 54:23
66:4
**numerous**
21:12
**nurse** 49:24
50:20
**ny** 2:4

| o |
| --- |

**o** 60:25
**oath** 3:13 11:3
11:6,10
**object** 13:13
**objection** 44:2
45:20 49:16
56:10
**objections** 3:7
5:5
**obtain** 64:11
**obviously** 10:3
**occurred** 31:23
**occurrence**
28:24
**october** 16:20
**offhand** 7:23
57:19 58:16
**office** 5:19
47:11,17 60:10
**officer** 3:12
7:16 8:2 16:24
17:2,12,15,18
17:19 20:16,18
22:25 23:7
27:9 30:18
31:7 32:2,17
34:21 35:3,11
35:11,12,15,17
35:18,18,21,25
36:6,7,8,10,11
36:11,17,18,18
36:23 37:3,7

Case 2:15-cv-05685-NR-MRG-LGD Document 281-1 Filed 07/17/23 Page 81 of 90 PageID Page 2634

37:24 43:8,21
46:16 48:9
51:24 58:3,22
59:4,9 60:9
64:12,13 65:2
**officer's** 29:13
29:16 30:7,8
**officers** 1:10
14:15 18:19,19
19:6,11,21
20:8,9 21:2
27:15 30:11
43:22 51:4,20
51:25 52:7
58:19 64:2
**official** 1:9
**okay** 12:20
13:25 41:20
47:12 55:12
56:15
**once** 6:22 7:14
21:15,16 57:20
57:22 60:14
61:21
**ones** 52:8,9
**opeds** 41:10,17
**open** 9:3,18,20
9:25 10:3 28:5
28:6 37:3
**opened** 8:25
43:6
**operating**
50:17

**operations**
28:25 61:4
**opportunities**
24:25
**opportunity**
37:2
**orally** 12:25
**orders** 33:4
36:5,23 38:18
38:19 41:13
42:21 49:23
50:3
**original** 29:12
**os** 61:3
**outcome** 5:4
8:3 67:21
**outside** 28:24
39:6,6 42:12
42:14
**overhead** 41:23
41:25 42:3,6
45:6,9 46:13
**overheads**
41:19,20
**oversaw** 18:18
19:11
**oversee** 21:9
22:24 23:18
**overseeing**
20:22,25 23:12
24:16
**own** 23:22

**p**

**p** 2:2,2
**page** 47:6 68:3
69:4,7,10,13,16
69:19
**pain** 50:9
**palumbo** 34:17
36:17,18,23
37:3,25 43:21
51:15,24
**paper** 10:6
**paragraph**
31:15,22,25
32:5,15,18,19
32:25 33:2
34:13 37:23
40:17 46:21
**paragraphs**
32:13
**part** 20:15,17
20:21 21:22
23:2 24:12
25:18 31:21
32:4 47:18,19
48:13,22 53:18
62:10,12 64:21
**participants**
4:9
**parties** 3:4 4:13
**party** 5:3
**patrolling** 21:2
**pending** 13:24

**perfectly** 28:10
**perform** 38:22
**period** 67:19
**person** 35:9
**personally** 30:5
30:10,12
**phased** 61:13
**phone** 10:13
14:10
**physical** 24:16
40:25 46:3
50:24 51:5,7
**place** 4:12 7:20
67:12
**placed** 38:14,24
41:24 43:14,18
44:6,22 47:16
49:4 50:5
**placing** 44:24
**plaintiff** 1:7,19
2:3 5:14 6:9
**plaintiff's** 28:2
28:3 54:22,25
68:4,7
**plaintiffs** 4:18
**please** 4:5 5:6
6:10,14 8:19
9:2,2 12:13
13:6,20 14:22
28:5
**plexiglas** 34:25
**point** 8:18 26:4
47:20 49:9
50:7,22,25

Case 2:15-cv-05686-NR-MRG-LGD Document 281278-1 Filed 07/17/2613/23 Page Page 82 of 820 PageID Page ID #2635 2023

61:11
**portion** 31:19
  31:20 47:2
  49:8
**position** 36:2
**positioning**
  52:20
**post** 15:7,10,15
  15:23,25
**power** 23:22
**practice** 25:19
**prepare** 14:3
**preparing**
  14:18 45:19
**prerequisites**
  22:6 60:7
**present** 2:15
  48:10
**prevent** 11:16
  11:20 12:5
  52:22
**previously**
  14:22 27:25
**prior** 8:9 22:7
  54:14 67:8
**privacy** 42:9
**probably** 21:11
  47:3 58:4
**procedure** 41:2
  50:18 62:15
**procedures**
  41:5 60:21
  61:4

**proceed** 5:24
**proceeding** 5:5
**proceedings**
  67:15
**process** 32:11
  64:8
**progress** 60:6
**promoted**
  17:22,24,24,25
**proper** 26:3
  37:5 39:19
  43:15
**properly** 26:3
  36:25 43:15
**provide** 6:14
  11:12,25 12:19
**provided** 58:24
  67:18
**providing**
  11:20 12:5,6
**ps** 60:25 61:3
**public** 1:22 6:3
  67:6 70:19
**pulled** 20:24
**purpose** 57:10
**pursuant** 1:19
**put** 21:10,11
  25:16 36:25
  37:3,17 39:10
  40:4 41:11
  43:25 44:20
  50:17 53:6
  64:19

**puts** 51:23
**putting** 24:20
  25:25 43:23

**q**

**quality** 4:7,8
**question** 3:8
  12:13,14,18,19
  13:9,10,17
  56:11
**questions** 11:13
  11:17,25 12:6
  12:24,25 13:5
  13:14,24 65:22

**r**

**r** 2:2 6:2 67:1
  69:3,3
**ranting** 33:22
**read** 26:10 28:9
  47:3 70:5
**readily** 39:8,16
**ready** 23:16
**really** 27:3,4
**reason** 11:15
  49:22 52:5
  53:16 69:6,9
  69:12,15,18,21
**recall** 22:12
  24:11,14 27:18
  30:21 34:3
  37:22 38:17,21
  40:10 41:4,22
  45:7 47:15
  48:9 49:14

50:23 52:24
56:25 57:19
58:10,20 61:18
**receive** 52:25
  61:19
**received** 61:8
**recess** 59:22
  65:17
**recollection**
  38:3,6 56:7
  60:22
**record** 4:3,14
  5:10 6:11
  37:19 59:20,24
  65:16,19 66:2
**recorded** 4:11
  4:16
**recorder** 37:11
**recording** 4:7
  4:12 37:11,11
  37:13,14 45:13
  46:17,18
**recreation**
  17:18
**recruited** 22:4
**reduced** 67:13
**refer** 20:2
  35:10
**referring** 26:13
  26:16
**reflect** 28:22
  30:4
**reflects** 28:23

Case 2:15-cv-05685-NR-MRG-LGD Document 281278-1 Filed 07/17/26/23/26 Page 83 of 90 of 90 Page ID Page ID 2636 2024

refrained  40:12
refresh  9:13
  56:6
regarding
  41:23 53:24
  56:3 57:5,7
  63:3
regular  62:13
regularly  62:16
related  5:3 7:4
  27:12 56:3
remember  6:25
  7:22,24 8:3,14
  26:23,25 27:5
  40:15 41:8
  48:7 50:7
  55:23 56:16,23
  58:6
remote  1:18
remotely  4:6
  5:8 8:12
report  19:13,15
  26:10,12,13,14
  26:17,24 27:22
  28:4,16,20
  29:2,10,13,16
  29:25 30:14
  31:11,19 32:4
  32:23 45:19
  46:21,23 47:2
  47:4,6 53:17
  53:18,21 60:20
  68:6

reported  58:21
reporter  1:22
  4:25 5:23
  12:11,23 67:5
  67:19
reports  62:4
represent  6:8
representing
  4:23
request  13:23
requested
  67:17,17
require  44:23
  44:25
required  11:10
  70:13
reserved  3:8
resist  49:24
resolve  63:20
  63:21,21
resolving  63:14
respect  41:5
respective  3:4
response  19:24
  20:7
responsibilities
  19:8 20:22
  23:13,14
responsibility
  48:2,5,20
responsible
  25:21,25 34:23
  46:16 63:8,11
  63:14

restates  26:3
restrained
  43:12
restraint  25:16
  25:22 26:2
  34:17 37:16
  38:15,25 39:2
  39:5,10,18
  40:12,20 41:24
  43:19,23,25
  44:23,24,25
  49:12 53:7
  62:8,14,15,17
restraints
  36:20,21 37:4
  39:18 43:14,18
  44:7,16,17
  51:9,11,24
  52:13
retained  64:24
  66:5
retire  16:8
retired  4:17
  16:6,9,15
retirement  18:4
  18:14
review  14:17
  14:21 28:16
  30:13 32:13
  45:15,18,24
  46:9,11,12,13
  46:20 55:9
  62:3 67:16

reviewed  14:22
  26:25 28:18
  29:8 46:25
  56:13
reviewing
  26:24 28:13,14
  53:20 55:11
  63:11
right  9:10 10:4
  33:7 34:17
  36:14,16 39:6
  40:6
rikers  22:14,15
riverhead  6:16
  7:21 16:24
  17:2,8,12 18:6
  18:7,22 26:22
  49:8 53:12,14
  53:25
role  8:6 16:21
  16:23 17:10,17
  18:16,21 19:3
  19:14 20:20
  23:3,5 25:4
  36:14,15,20
  47:21 48:25
  49:3,10 61:17
roles  24:5,7
  38:5,6
rolling  49:5
ronald  1:10
room  10:20,22
  10:23 40:11

Case 2:15-cv-05685-NR-MRJ-LGD Document 281-18 Filed 07/17/23 Page 84 of 90 PageID Page ID #: 2637 2025

| | | | |
|---|---|---|---|
| **rules** 8:13 12:9 | **secured** 37:16 | 61:14,17 62:13 | **shield** 1:10,10 |

**rules** 8:13 12:9

**s**

**s** 2:2 68:2 69:3
**saver** 10:5
**saying** 39:17
  46:10
**says** 30:18,24
  32:3 33:8,16
  34:23 35:5
  38:24
**sc002945** 54:24
**school** 15:8
**scored** 60:5
**scraps** 44:18
**screaming**
  50:11
**screen** 4:10
  10:4
**scrolling** 29:4
**se** 46:8
**sealing** 3:5
**seatbelt** 44:9
**second** 15:8
  28:16 31:21
  32:5,19 33:2
  35:9 47:5
**secondary**
  15:25
**section** 28:12
  64:14
**secure** 35:14
  36:3,6,15,22
  44:10

**secured** 37:16
  39:18 47:10
  49:6 51:20
**securing** 25:22
**security** 22:24
**see** 9:3,6,8 28:7
  29:5 30:11,19
  31:21 33:6,25
  39:20 44:13
  47:13,14 53:19
  63:19 64:4
  65:8
**seeing** 8:19
  10:4
**seen** 4:9 30:5
  30:10 40:20
**self** 20:6
**senior** 60:23
**sent** 22:14
**sentence** 34:14
  38:10 39:21
  47:8,9,14
**separately**
  12:22
**sergeant** 4:16
  17:25 18:2,5,7
  18:11,13,17,18
  19:5,10,14,21
  20:14,18,21,22
  20:24 23:7,8
  23:11 24:9,15
  25:4 32:3
  47:22 58:2,5
  60:4,8,14

61:14,17 62:13
  63:16,17 64:17
  64:18
**sergeant's** 48:4
**sergeants** 60:23
**sert** 20:2,5,12
  20:15,17,21,22
  20:25 21:5,20
  21:23 22:2,3,7
  22:10,20,23
  23:2,9,12,24
  24:8,12,16
  25:24 26:4,7
  34:5,10,14,16
  37:24 47:19,22
  48:12,13,22
  49:5,8 61:15
  61:16,19,25
  62:10,13
**serve** 60:12
**session** 8:23
**set** 23:16
**several** 21:21
  23:5 24:25
**shaking** 13:2
**share** 9:6,11,20
  27:22 55:4,5
**sheriff** 20:7
  27:7 41:14
**sheriff's** 16:17
  19:24 28:21
  60:10
**sheriffs** 61:2

**shield** 1:10,10
  1:11 31:17
  32:6,21 34:16
  34:24,25 35:3
  35:4,12
**shift** 17:2
**shorthand** 1:22
  67:5,12
**shot** 38:12
  49:21,25
**shoulder** 54:8
  54:12
**sic** 41:10
**sign** 29:13,24
  30:6 31:18,24
  32:2,13,15,19
  32:21
**signature** 31:14
  31:15,17 32:22
  67:24
**signed** 3:11,14
  26:14 29:16,17
  30:4 31:13
  32:6 48:15
**signing** 30:8
  32:5,7,8,22
**similar** 18:22
  18:23
**sit** 51:13
**siter** 1:10
**sitler** 34:17
  36:10,11 37:25
  38:14 43:3,8
  43:18,22 52:7

Case 2:15-cv-05686-NR-MRG-LGD Document 281-1 Filed 07/17/23 Page 85 of 90 Page ID #: 2638

| | | | |
|---|---|---|---|
| sitting 10:12,14 | stands 49:19 | 16:19,22 22:20 | tactics 46:6 |
| situation 23:15 | start 6:10 | 28:21 60:10 | 62:2,5 |
| situations | 12:18 16:18 | 69:1 70:1 | take 4:12 7:20 |
| 18:20 20:10 | 44:7 | suffolkcount... | 11:6 12:11 |
| sixth 34:12 | started 22:3 | 2:12 | 13:20 59:16 |
| slot 24:21 | 33:21 | suicidal 53:22 | 60:12 61:6,16 |
| 38:13 42:18 | starting 32:25 | sundaram 2:6 | 65:12 |
| 51:17,21,23 | 34:13 38:11 | 5:15 | taken 1:19 4:17 |
| smeared 49:18 | state 1:23 2:9 | supervising | 11:23 44:17 |
| smearing 33:24 | 5:6,9 67:2,6 | 18:19 | 59:22 65:17 |
| solve 64:15,20 | stated 52:6 | supervisor 30:2 | 67:11 |
| somebody | statement 55:2 | 31:9 47:20,22 | talk 9:10 60:24 |
| 10:23 | 55:15,17,21,24 | 60:16 61:7 | 62:4 |
| sorry 16:11 | 56:2,21 57:11 | supervisory | talked 14:14 |
| 41:17 | 58:25 68:9 | 49:10 60:18 | 27:14 |
| sort 38:9 | states 1:2 4:20 | support 58:25 | talking 27:9,10 |
| speak 28:13 | stating 6:11 | sure 12:11 | tape 46:4,9,11 |
| special 60:15 | step 43:7 | 23:16 26:2 | 46:12,13 |
| specific 19:2 | steps 64:14 | 30:16 34:11 | target 58:18 |
| 20:20 22:9 | stipulated 3:2,6 | 36:12,24 40:21 | team 8:6,10 |
| 23:3 29:2 48:6 | 3:10 | 40:24 51:11 | 19:24 20:2,5,7 |
| 61:16 | stop 21:19,20 | 52:2,20 57:8 | 20:15,17,21,25 |
| specifically | 49:5 | 59:18 62:24 | 22:3,5,15 23:2 |
| 24:11 41:4 | study 15:11,14 | 65:14 | 23:4,6,9,10,12 |
| 46:24 | stumble 52:21 | surgery 54:8 | 23:15,24 25:24 |
| specifics 27:4 | submitting | swear 5:23 | 26:7 34:6,10 |
| speed 60:25 | 64:9 | switched 17:11 | 34:15 36:2 |
| ss 67:3 | subscribed | sworn 3:12,14 | 37:15,24 39:15 |
| stack 35:10 | 70:14 | 6:3 16:20 67:9 | 47:22 48:13 |
| staff 53:6 | suffered 21:21 | 70:14 | 61:15,25 |
| standard 25:18 | suffolk 1:9 2:8 | **t** | teams 20:23 |
| 28:20 41:2,5 | 4:19 5:17,19 | t 6:2 67:1,1 | 21:5 22:20 |
| 50:17 | 7:5,17 15:5,12 | 68:2 69:3,3 | 24:12,16 |
| | 15:19,21 16:16 | | |

Case 2:15-cv-05685-NR-MRG-LGD Document 281-1 Filed 07/17/23 Page 86 of 90 PageID Page ID #: 2632

**technology** 4:7
**tell** 11:10
**ten** 57:2
**term** 41:18
**terms** 48:19
**test** 60:5,13
**testified** 6:4,19
  7:7
**testify** 8:5 67:9
**testifying** 11:3
**testimony**
  12:12 66:3
  70:9
**thank** 65:20,23
  65:24
**thing** 10:5
  40:18 44:16
**things** 23:5
  63:5
**think** 10:2
  11:16 45:4
**third** 32:14
  46:20
**three** 38:9
**threshold** 43:9
**time** 3:9 5:6
  13:14,14,19
  18:6 27:8,19
  35:19 36:9,13
  37:12,15,16,20
  40:13 41:3
  47:4 49:11
  53:5 57:17
  59:20,24 60:11

60:21 61:13
  62:18 65:7,16
  65:19,21 66:6
  67:12
**times** 6:21 7:13
  45:14 58:7
**today** 11:3,17
  65:21
**today's** 66:3
**took** 8:15 40:3
  60:5
**top** 7:3 26:9
  29:5 30:16,17
  53:15 55:25
  58:9
**torts** 2:9
**total** 66:4
**toward** 47:8
**towards** 47:7
**track** 47:22
**trained** 20:8,12
  22:15,16 62:7
  62:16
**training** 60:15
  60:17,18 61:5
  61:7,16,20
  62:11,12
**trainings** 22:10
  22:12 61:7,22
**transcribing**
  12:23
**transcript**
  67:14,17 70:5
  70:9

**transferred**
  18:9 53:11,14
**transfers** 53:24
**transport** 49:7
  49:13
**treatment** 53:4
  63:3
**trial** 3:9
**tries** 35:13
**trip** 51:12
  52:14
**trouble** 8:19
**true** 67:14 70:8
**truth** 11:10
  67:10,10,10
**truthful** 11:25
  12:7
**try** 12:18 13:8
  22:4
**two** 15:6 32:12
  52:9 60:12
**typewritten**
  67:13

**u**

**ultimate** 25:2,5
  25:14
**unclear** 13:4
**under** 11:3
  12:4 23:22
**undergo** 22:9
  60:15
**underlying**
  30:13

**understand**
  11:2,5,9,25
  13:5,11,16
  20:3 39:3
  49:17
**understanding**
  11:16 12:6
**understood**
  13:10
**unit** 4:15 59:21
  59:25
**united** 1:2 4:20
**upper** 44:8
**use** 25:2,11
  35:2 42:10
  46:2 59:5 62:6
  62:7,17 64:5
  65:3
**used** 24:17
  41:18 59:8
  62:19 66:4
**using** 4:6 59:12

**v**

**v** 6:2
**various** 18:20
**velcro** 44:17
**veritext** 4:24
  5:2 66:5
**versus** 4:19
**veterans** 2:10
**vicinity** 48:17
**video** 4:11,15
  8:12 10:3,14

Case 2:15-cv-05685-NR-MRLGD Document 281278-1 Filed 07/17/263/2 Page 87 of 890 Page ID Page ID #264 2028

34:18 37:9,10 45:11,12 46:17 47:9,10,15,16
**videographer** 2:16 4:2,25 5:22 59:19,23 65:15,18,25
**videotape** 37:19 45:8 47:23 48:7
**videotaped** 1:18
**view** 9:15 10:7 48:18
**viewer** 8:24 9:4 9:17
**violent** 35:3
**virtual** 1:18 4:6
**visconti** 1:21 5:2 67:5,25
**vitals** 40:22
**vs** 69:1 70:1

### w

**wagner** 1:10 30:19,22 31:6 31:7,10 32:3 32:12,14,17 48:10
**wait** 12:13
**waiting** 10:15 49:7,13
**waived** 3:5

**walk** 24:23
**walked** 50:4 51:10
**walking** 51:10 52:11,12
**want** 9:10 51:11
**wanted** 23:9 41:9 60:6
**warden** 1:9
**way** 52:18
**week** 54:8
**weeks** 17:7
**went** 15:9 60:16,19
**wheel** 40:8
**william** 1:21 5:2 67:5,25
**window** 9:16 33:23,24 49:19
**wise** 10:6
**witness** 1:20 4:10 5:23 10:7 21:6 28:14 44:4 53:20 55:11 65:23 67:8,22
**witnessed** 59:4
**witnessing** 34:3
**wood** 2:11 5:17 5:18 9:5,19 10:2,11,19,22 13:15 28:7,11 29:4 44:2,5

45:20 49:16 55:6 56:10 59:18 65:14,24
**work** 7:4 16:14 19:18 31:8 43:24
**worked** 16:16 17:7
**working** 16:18 26:7
**workings** 62:14
**wrap** 35:13
**write** 32:17 33:20 64:14,16
**writing** 60:20
**written** 32:19
**wrote** 37:24 40:16 46:24

### x

**x** 1:5,13 68:2

### y

**y** 6:2
**yaphank** 18:10 18:12,13,22 19:3,4,9 21:2,5 26:22 33:11,11 35:19 36:9,12 36:19 37:8 53:25
**yard** 17:18,19
**yeah** 21:16 29:21 57:23

**year** 7:22 15:6 57:20
**years** 15:6 17:3 17:8,19 57:2 57:22 60:12
**yelled** 50:9
**yep** 28:18 55:10
**york** 1:3,21,23 2:4,10 4:21,24 6:17 7:21 67:2 67:4,6
**ypmy009** 33:3 33:9

### z

**zone** 63:16 64:18
**zoom** 1:18 8:23 9:16
**zorcik** 34:16,20 34:21 35:11 37:25

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.